UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 03-10370-DPW

---
UNITED STATES OF AMERICA )
                                        )
V.                                      )
                                        )
                                        )
DOUGLAS BANNERMAN              )
---

## THE DEFENDANT BANNERMAN'S FACTUAL
## AND LEGAL MEMORANDUM IN SUPPORT OF HIS
## MOTION TO SUPPRESS EVIDENCE PRODUCED BY WIRETAP

### I.    INTRODUCTION

It is respectfully submitted the instant factual and legal memorandum has been prepared to assist the Court when deciding the Defendant Bannerman's Motion to Suppress Evidence Produced by Wiretaps. Bannerman asserts that the initial wiretap application made on July 17, 2004, which was supported by an Affidavit prepared by Special Agent Brian Tomasetta, and sworn to before the Honorable Judge Tauro on July 21, 2003, did not provide a sufficient and lawful basis for the issuance of the initial interception of telephone conversations. Further, if the initial wiretap authorization was unlawful, all subsequent interception authorizations which utilized information obtained from the first authorized interception period would similarly be unlawful, as would the search of his (Bannerman's) apartment at 90 Boylston Street, Apartment 17E, Boston, MA, because said search was based on information unlawfully obtained as a result of the first authorization permitting electronic surveillance.

### II.    FACTS

A careful review of the application presented to the Court seeking authorization to electronically intercept conversations reflect the target telephone was believed to be a phone used by one Kurt Walter. The number was identified as (617) 901-0104 (hereinafter referred to as the "target telephone"). The application further states that

Walter, Bannerman and others as yet unknown, were alleged to have committed violations of Title 21 U.S.C. § 952 and 963 (conspiracy to import cocaine and marijuana).

The wiretap application was based on the Affidavit of Brian Tomasetta (a copy which is attached hereto and marked Exhibit A). A careful reading of this Affidavit reveals that Special Agent Tomasetta had at the time the Affidavit was prepared over fourteen years of experience in law enforcement, a bachelor of science degree in criminal justice, and thirteen years of experience as a drug enforcement agent (who used and was familiar with various investigative techniques, including but not limited to the use of confidential sources to obtain information, the use of cooperating witnesses to uncover narcotics purchases, the exploitation of opportunities for direct involvement of undercover agents in drug transactions, and the use of physical surveillance of individuals involved in drug related activity). (See Affiant's background as set forth in his Affidavit at pages 1 and 2).[1]

Agent Tomasetta's Affidavit reflects that the investigation of the Defendant and others had begun in September of 2001 (Aff. p. 3), and it included a review of tapes and transcripts of consensual tape recordings made during the investigation, the debriefing of cooperating witness and confidential informants, and the review of numerous records from public and private entities including telephone toll records, and information generated from pen registers relating to the target telephone, and the telephones of other targets of the investigation. (Aff. p.3).

Agent Tomasetta's Affidavit is replete with details concerning cooperating witness "CW-1" who made consensually recorded conversations with one of the targeted defendants (Walter), and references to "CI-1" who provided law enforcement with the target telephone number as a contact number for arranging drug conversations. (Aff. p. 6).

---

[1] All references to Agent Brian Tomasetta's Affidavit will be Aff. p.____.

CW-1 provided information to the Drug Enforcement Administration that it supplied Walter on more than eight occasions after September 2001 with marijuana. (Aff. p. 25).

CW-1 agreed to cooperate with the DEA, collect money from its customers and then make payments to Walter under the supervision and control of the DEA. CW-1 participated in controlled meetings between CW-1 and Walter to exchange drug proceeds and marijuana in May and June 2003. (Aff. p. 43, 44). The DEA also conducted surveillances of meetings between Walter and CW-1 on numerous dates including June 12, 2003.

Traditional investigative work resulted in law enforcement agents observing one of the targets of the investigation deliver a duffle bag to one Gary D. Newell, a suspected marijuana transporter and money courier, which contained $221,910.00, which monies were seized on January 24, 2003. (Aff. pp. 6, 81).

The Affidavit also recounts the discovery of evidence, which established a strong connection between Douglas Bannerman and Kurt Walter, the principal user of the target telephone.

The DEA also had, and was utilizing CW-2, who provided information regarding Douglas Bannerman, which dated as far back as the end of 1998, in Boston. The information included the specifics of a marijuana transaction which took place during the summer of 2002, when it is alleged an associate named Ferin Martin a/k/a Mustard drove to Tuscan Arizona to purchase 800 pounds of marijuana for Bannerman. (Aff. p. 48).

CW-2 provided additional information that starting in October 2001 and ending in or about March 2002 Bannerman purchased several loads of marijuana brokered by CW-2 in varying amounts. (Aff. pp. 48, 49).

3

The DEA's analysis of telephone toll records also indicated Bannerman had been in contact with a marijuana supplier identified as Moreno-Fernandez in or about October 2002. (Aff. p. 50). The DEA also developed information from sources identified as CW-3 and CW-4 concerning marijuana trafficking activity beginning in the late 1990's and continuing through fall of 2001.

The Affidavit further recites that since January 2002 law enforcement agents had obtained and analyzed telephone toll records, and trace information for wireless telephones, voicemail boxes and pagers used by Walter, Bannerman, Milo and others. In fact, a pen register and telephone toll records for the target telephone had been authorized since March 14, 2003. (Aff. p. 53).

Agent Tomasetta's Affidavit also recounts in great detail certain Sprint telephone information regarding number (617) 970-8308 subscribed to Karen Woo, identified by pen register analysis as the telephone used by Bannerman, and a second number (617) 780-8615, a prepaid telephone subscribed to Dawn Remington, 120 Newbury Street, Boston, MA, also believed to be used by Bannerman based on pen register data analysis. Aff. p. 54 and 55).

**Clearly, the availability of four cooperating witnesses, a confidential informant, and the large amount of information generated by pen registers and surveillance as referred to above demonstrate that normal investigatory techniques were providing substantial and valuable information. [Emphasis added].**

In Section VII of the Tomasetta Affidavit the Affiant purports to outline and explain why the exhaustion of normal investigative techniques have been tried and failed, or appear unlikely to succeed if tried, or are too dangerous to employ.

For example when discussing CW-1 the Affidavit recites that CW-1 does not know Walter's true name, and does not know where Walter lives. This information is inaccurate and misleading based on a review of the DEA-6 reports (including

4

surveillance activity), which include information concerning Walter's background, where he resides, the type of vehicle he operates, and the telephones that he utilizes. It is also to be noted that in the application affidavit itself Agent Tomasetta specifically identified Kurt Walter as an individual who resides at 25 Royal Road, Brookline, MA. (Aff. p. 3).

Similarly, the agent affiant asserts that although CW-2 has information about Bannerman, because he was directly involved in brokering drug transactions, he has no current information regarding the source of Bannerman's drugs or how they are transported or stored in Massachusetts. A reading of the information provided by CW-2 in the investigative reports clearly suggests that he could, if asked by a representative of law enforcement, provide direct testimony concerning drug related transactions, which are not barred by the statute of limitations against Bannerman. CW-2 also had the ability to continue to contact Bannerman via his voicemail box.

With regard to CW-3 and CW-4 they both appear to have historical information relating to another named target Milo. It also appears that CW-4 was willing to make consensually monitored telephone calls to Milo. (Aff. p. 62).

The Affidavit also suggests that introductions to one or more targets would be unlikely, based on the fact that Walter declined to give his telephone number to CI-2 at a marathon party. (Aff. p. 66). Also contained in this section is the agents unsupported speculative conclusion that one or more of the targets are sensitive to detection by law enforcement, based on a claimed series of actions following the January 24, 2004 seizure of money from Newell, and a reduced amount of use by Bannerman of a voicemail box, which was ultimately turned off for non payment on June 23, 2003. (Aff. p. 66).

The Affidavit then discusses attempts at conducting physical surveillances which were claimed to have had very limited success. (Aff. p. 67). A review of the DEA-6 reports covering the course of the investigation prior to the wiretap application belie this claim. More particularly, numerous observations are made concerning Mr. Walter's activities including the audio/video taping of his (Walters) meetings with CI-1 at its

5

home, and video surveillances of other scheduled meetings, where money and marijuana were transferred. Other aspects of the investigation concerning the ability to conduct surveillances have been blacked out, in the information provided to defense counsel, and consequently that information cannot be commented upon in this submission.

Conspicuous by its absence throughout the entire affidavit of agent Tomasetta is any suggestion that the conducting of physical surveillances, the execution of search warrants or trash searches or the use of the other investigative procedures or tactics would in any way be considered dangerous to the safety of the Drug Enforcement Administration Agents.

Agent Tomasetta acknowledges that the investigation has revealed that Walter is distributing marijuana, but not the identities of **all** sources of supply, the number and location of his stash location(s), or his current customers other than CW-1. (Aff. p. 58). Officer Tomasetta concedes that the investigatory techniques utilized to date have produced valuable, but limited results. (Aff. p. 59).

## III.    ARGUMENT

**A.    The Affidavit in support of the Application For Authorization to Intercept Fails to Provide a Full and Complete Statement as to Whether or Not Other Investigative Procedures Have Been Tried and Failed or Why They Reasonably Appear to Be Unlikely to Succeed If Tried or To Be Too Dangerous, as Required By 18 U.S.C.A. §2518 (1) (c).**

Every application for an order authorizing the use of electronic surveillance must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be to dangerous." 18 U.S.C.A. § 2518(1)(c). Unless the issuing judge finds that this necessity requirement has been satisfied, no order authorizing the use of electronic surveillance may be entered, 18 U.S.C.A. § 2518 (3)(c).

"[I]n a society which values privacy and the rights of the individual, wiretapping is to be distinctly the exception and not the rule." United States v. Hoffman, 832 F.2d 1299, 1307 (1st Cir. 1987). To ensure that law enforcement authorities do not resort to wiretapping when traditional investigative techniques suffice, the government is "required to make a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic surveillance of telephone calls." United States v. Ashley, 876 F. 2d 1069, 1072 (1st Cir. 1989), quoting United States v. Hoffman, 832 F. 2d at 1306-07. Before an interception order may issue the "district court must satisfy itself that the government has used normal techniques but has encountered difficulties in penetrating or in gathering evidence to a point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable." United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986). See, e.g., United States v. Carneiro, 861 F. 2d 1171, 1176 (9th Cir. 1998). Moreover, the necessity requirement must be satisfied as to each telephone or location for which the interception authorization is sought. See, e.g., United States v. Brone, 792 F. 2d 1504, 1507 (9th Cir. 1986); United States v. Carneiro, 861 F.2d at 1180-82.

At a minimum, to satisfy the necessity requirement, the affidavit must detail a factual predicate to support the affiant' statements that ordinary investigative techniques have not and will not suffice. See, e.g., United States v. Brone, 792 F. 2d 1504, 1506 (9th Cir. 1986); United States v. Armocida, 515 F.2d 29, 38 (3d Cir. 1975); United States v. Spagnulo, 549 F. 2d 705, 710 (9th Cir. 1977). Generalizations and boilerplate recitations regarding why traditional investigative techniques have not suffered or why, if tried, they would not succeed , do not satisfy the critical necessity requirement, one of the central statutory safeguards against unwarranted invasions of privacy. Se. e.g., United States v. Oriakhi, 57 F.3d 1290, 1298 94th Cir. 1995) (government may not make requisite necessity showing through a mere "boilerplate recitation of the difficulties of gathering useable evidence [r]ather the government must base its need on real facts and just specifically describe how, in the case at hand, it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence with normal techniques to the

point where wiretapping becomes reasonable"); United States v. Ashley, 876 F.2d at
1072 (bare conclusory statements that normal techniques would be unproductive, based
solely on affiant's prior experience, do not comply with §2518(1)(c)); United States v.
Vento, 533 F. 2d 838, 849 (3d Cir. 1976) (use of boilerplate and absence of particulars in
wiretap applications have not been permitted lest wiretapping become established as a
routine investigative recourse, contrary to the restrictive intent of Congress); United
States v. DiMuro, 540 F.2d 503, 510 (1st Cir. 1976) (agent's bare conclusory statements
that normal investigative techniques are generally unproductive in dealing with gambling
operations insufficient); United States v. Kalustian, 529 F.2d 585, 590 (9th Cir. 1976)
(affidavit failed to satisfy necessity requirement because it failed to present any
information why this gambling case "presented any investigative problems which were
distinguishable in nature or degree from any other gambling case; United States v. Lilla,
699 F.2d 99, 104 (2d Cir. 1983) (rejecting generalized and conclusory statements that
other investigative procedures would prove unsuccessful); United States v. Spagnulo,
supra, 549 F.2d at 710 (affidavit composed solely of conclusions unsupported by
particular facts provides no basis for determination of compliance).

Section 2518(3)(c) imposes upon the district judge an independent obligation to
determine that the necessity of recourse to electronic surveillance has been adequately
demonstrated. See, e.g., United States v. Scibelli, 549 F.2d 222, 226, (1st Cir. 1977);
United States v. Ashley, 876 F.2d at 1072, 1073 (issuing judge must independently
conclude, based upon the affidavit, that antecedent efforts were adequate to comply with
§2518(3)(c)). The necessity requirement "directly and substantially implements the
congressional intention to limit the use of intercept procedures to those situations clearly
calling for their employment." United States v. Mondragon, 52 F.3d 291, 294 (10th Cir.
1995). While it may be more efficient for the government to engage in wiretapping
rather than pursue more time consuming avenues of investigation, such as physical
surveillance, "the statutory requirement that other investigative procedures be exhausted
before wiretapping reflects a congressional judgment that the cost of such efficiency in
terms of privacy interests is to high." United States v. Lilla, 699 F.2d at 105 n.7. As the
United States Court of Appeals for the Ninth Circuit has observed:

It is no doubt true that experienced agents at the outset of an investigation can anticipate with a fair degree of accuracy whether ordinary techniques will fail or prove to be "too dangerous." To delay the wiretap order while ordinary techniques are employed or to undertake to educate a district judge to enable him to appreciate their level of experience no doubt appears to such agents as a waste of time and resources. Their perception may be accurate, but congress has deprived it of decisive influence. The particularized showing here described is necessary. The district judge, not the agents, must determine whether the command of Congress has been obeyed. <u>United States v. Spagnulo</u>, 549 F.2d at 710-11.

The principal defect of the original application seeking authorization to intercept wire communications is that Agent Brian Tomasetta's affidavit does not contain a "full and complete statement; regarding prior investigative efforts geared toward gathering evidence against Walter, Bannerman, and others which have, according to the affidavit, been under investigation since 2001. The affidavit provides very little in the way of information regarding the full nature and scope of the information obtained during the previous two and one half (2 ½) years of investigation. Further the affidavit downplays and attempts to minimize the success achieved by traditional investigative efforts.

It is obvious from the documents, and DEA-6 reports which the Government has provided to the Defendant (although partially redacted) that substantial investigative effort was undertaken by local state and federal authorities, who at times acted in tandem over an extended period of time in several states. This extensive and sophisticated investigation resulted in information being obtained from four (4) confidential witnesses and at least one or more confidential informants. Counsel respectfully submits had the Government in their Affidavit chosen to provide an even more complete statement as to their investigative efforts they would not be able to overcome the burden of establishing why other investigative procedures have been tried and failed, or why they reasonable appear to be unlikely to succeed if tried, or to be to dangerous.

The affidavit in support of the request for authorization to conduct electronic interceptions does not contain a plausible explanation why the investigative procedures utilized to date should not be continued, based on the substantial body of information assembled as a result thereof. At least one substantial drug distributor, and numerous individuals to whom he had been distributing marijuana had been identified, and at least two separate individuals CI-1 and CW-2 could provide direct incriminating evidence against two of the principal targets of the investigation (Walter and Bannerman).

Counsel respectfully submits that the information submitted to the Court established that traditional investigative techniques had successfully generated substantial information, and would strongly support an inference that if continued, additional and even more substantial information would be forthcoming.

<u>CONCLUSION</u>

For all the foregoing reasons, the Defendant's Motion to Suppress must be granted.

> Respectfully submitted,
> Douglas Bannerman
> by his attorney,
>
> James Michael Merberg, Esquire
> 66 Long Wharf
> Boston, MA 02128
> (617) 723-1990

10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF THE | ) | |
| UNITED STATES OF AMERICA FOR AN ORDER | ) | M.B.D. No. 17 P 4: 42 |
| AUTHORIZING THE INTERCEPTION OF WIRE | ) | |
| COMMUNICATIONS | ) | U.S. DISTRICT COURT |

FILED
IN CLERKS OFFICE
2003 JUL 17 P 4: 42
U.S. DISTRICT COURT
DISTRICT OF MASS

## AFFIDAVIT OF SPECIAL AGENT BRIAN TOMASETTA

I, Brian Tomasetta, being duly sworn, hereby depose and state under oath:

### I.    THE AFFIANT'S BACKGROUND

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA") of the United States Department of Justice. I have been employed by DEA for approximately fourteen years. I am currently assigned to DEA's New England Field Division's Boston Office.

2.    I received a Bachelor of Science Degree in Criminal Justice from Westfield State College located in Westfield, Massachusetts in 1988. I was a Vermont State Trooper for approximately two years. In 1990, I graduated from the DEA's Basic Agent Training Course at the FBI Academy in Quantico, Virginia. This fourteen-week curriculum consisted of the study of federal law relating to narcotics violations, conspiracy, drug identification, surveillance, undercover negotiations as well as other drug law enforcement related subjects.

3.    While with DEA, I have participated in approximately 200 investigations relating to the possession, distribution and manufacturing of controlled substances, including marijuana, heroin, cocaine, crack cocaine, and other illegal drugs. Additionally, I have participated in approximately 100 narcotics-related search warrants and approximately 150 narcotics-related arrests. On many occasions, I have recruited, interviewed and directed confidential informants, executed search warrants for the evidence of trafficking controlled substances and worked in an undercover capacity posing as a purchaser of drugs. I have also served as a surveillance team member and

EXHIBIT A

supervisor leader on two Title III wire intercept investigations.

4.    During the above-referenced narcotics investigations, I have utilized various investigatory techniques including: (a) the use of confidential sources to obtain information, (b) the use of cooperating witnesses in undercover narcotics purchases, (c) the exploitation of opportunities for direct involvement of undercover agents in drug transactions, (d) the use of physical surveillance of individuals involved in drug trafficking, (e) the execution of search warrants at locations where narcotics and related evidence are concealed, and (f) the use of court-authorized electronic surveillance. I have participated in grand jury investigations, and I am familiar with the advantages and limitations of using the grand jury during an investigation. I also have interrogated defendants, informants, and suspects who were users, sellers, and distributors of controlled substances.

5.    Based on my training and experience, I am familiar with the methods by which members of organized drug conspiracies transport and distribute controlled substances. I am familiar with the manner by which narcotics traffickers use telephones, coded or slang telephone conversations, pagers, pager codes, and other means of communication to facilitate drug distribution.

6.    I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

7.    I submit this affidavit in support of an application for an order authorizing the interception of wire communications occurring over telephone number (617) 901-0104 and over any changed telephone number subsequently assigned to the wireless telephone bearing electronic serial number C12C1FEA as well as over any changed electronic serial number assigned to telephone

(2)

number (617) 901-0104 ("Target Telephone 1" or "the Target Telephone").

8.    According to information provided by AT&T Wireless, Target Telephone 1 is a wireless telephone that is subscribed to in the name of Kurt WALTER, 25 Royal Road, Brookline Massachusetts. The electronic serial number for Target Telephone 1 is C12C1FEA. WALTER began service on Target Telephone 1 on January 25, 1999. As discussed in more detail below and as based upon consensually recorded calls to Target Telephone 1, analysis of pen register data and toll record analysis, and information from a cooperating witness and a confidential informant, there is probable cause to believe that Target Telephone 1 is being used by Kurt WALTER to make and receive telephone calls to/from various members of a conspiracy involved in the transportation and distribution of large quantities of marijuana and cocaine.

9.    Since September of 2001, I have participated in an investigation of a group of individuals engaged in drug trafficking and money laundering activities. I am the co-case agent for this investigation; my co-case agent is DEA Special Agent Dennis Barton. During the investigation, I have conducted surveillance, reviewed tapes and transcripts of consensual tape-recordings made during the investigation, debriefed cooperating witnesses and confidential informants, discussed the investigation with other agents familiar with the investigation, reviewed numerous records obtained from private and public entities, and reviewed telephone toll records and information obtained from pen registers relating to the Target Telephone and the telephones of other Targets of this investigation. I am familiar with all aspects of the investigation as a result of my personal participation in the investigation and my discussions with and review of reports by other law enforcement officers involved with the investigation.

10.    Based on this familiarity and other information that I have reviewed and determined

( 3 )

to be reliable. I allege the following:

(a)    There is probable cause to believe that WALTER, Douglas K. BANNERMAN, John O. CLARK, Ivan MORENO-FERNANDEZ, Gary MILO, Frank GIGLIO, Gary D. NEWELL, Simon RINGHAM, John GRAHAM, James BALDINI, William C. WRIGHT, III (the "Targets"), as well as others as yet unknown, have committed, are committing, and/or will continue to commit violations of Title 21, United States Code, Sections 952 and 963 (Conspiracy to Import Cocaine and Marijuana), Title 21, United States Code, Section 952 (Importation of Cocaine and Marijuana), Title 21, United States Code, Section 841(a)(1) (Distribution and Possession with Intent to Distribute Cocaine and Marijuana); Title 21, United States Code, Section 843(b) (Unlawful Use of a Communications Facility); Title 21, United States Code, Sections 846 and 841(a)(1) (Conspiracy to Distribute and to Possess with Intent to Distribute Cocaine and Marijuana); Title 18, United States Code, Sections 1956 and 1957 (Money Laundering); Title 18, United States Code, Section 1956(h) (Conspiracy to Launder Money); and Title 18, United States Code, Section 2 (Aiding and Abetting).

(b)    There is probable cause to believe that the particular wire communications pertaining to the crimes set forth in Paragraph 10(a) of the Targets, as well as others as yet unknown, will be obtained through the interception of such communications to and from the Target Telephone, and over any changed telephone number subsequently assigned to the wireless telephone bearing the same electronic serial number as well as over any changed electronic serial number assigned to the same telephone number. In particular, these communications are expected to reveal:

(1)    the nature, extent, and methods of the drug importation, drug transportation, drug distribution, and money laundering business of the Targets and others;

(2)    the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in the illegal activities of the Targets, including, but not limited to, drug suppliers, couriers, drug distributors, drug customers of the Targets, collectors of drug proceeds, and transporters of drug proceeds;

(3)    evidence regarding the importation, transportation and distribution of drugs, money, and other proceeds involved in the above illegal activities;

(4)    the existence and location of records related to the above illegal activities;

(5)    the location and source of resources used to finance the above illegal activities;

(6)    the location and disposition of proceeds from the above illegal activities;

( 4 )

(7)    the locations and items used in furtherance of the above illegal activities, including, but not limited to, the locations where drugs are imported, transported, and stored prior to distribution; and

(8)    the times, dates, and locations when and where the persons involved in the above illegal activity import narcotics, distribute narcotics and meet to discuss their narcotics trafficking activities.

In addition, these wire communications are expected to constitute admissible evidence of the commission of the above offenses; and

(c)    normal investigative techniques have been tried and failed, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

12.    Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are needed to establish the necessary foundation for an order authorizing the interception of wire communications over Target Telephone 1.

## II.    PERSONS EXPECTED TO BE INTERCEPTED

13.    There is probable cause to believe that the interception of wire communications over Target Telephone 1 will involve conversations of the following individuals and other unknown individuals about the above-referenced offenses:

## KURT WALTER

14.    WALTER (a/k/a "CORT") is a United States citizen born in 1965. According to Massachusetts Registry of Motor Vehicles ("RMV") records, WALTER's residence is at 25 Royal Road, Brookline, Massachusetts. He has a pending charge in Monroe County, Florida for driving under the influence of alcohol or drugs arising from a January 16, 2003 arrest. According to a

(5)

Massachusetts criminal record check, WALTER was arrested for various offenses, including assault with a dangerous weapon, breaking and entering in the nighttime, malicious destruction of property, unlawful discharge of a firearm and trespassing in the 1980s. According to NADDIS, WALTER's name arose in the investigation of Edwin and Miguel Soto who were investigated for cocaine trafficking. Specifically, the investigation revealed that Target Telephone 1, subscribed to by WALTER, was called by a telephone subscribed to by Edwin Soto in or about 1999. No other information about WALTER's involvement was revealed during the course of that investigation.

15. WALTER is the user of the Target Telephone. As discussed in more detail below, a cooperating witness ("CW-1") has recently communicated on Target Telephone 1 with WALTER to discuss marijuana transactions and payments and/or to arrange meetings with WALTER regarding same. CW-1 subsequently met, while under law enforcement surveillance, with WALTER to pay for previous deliveries of marijuana and to receive additional quantities of marijuana. Moreover, another source, a confidential informant ("CI-1") has informed me that WALTER has previously provided Target Telephone 1 as a contact number for arranging drug transactions. In addition, I also have determined that WALTER was using Target Telephone 1 during an outdoor party that he hosted on Beacon Street along the route of the Boston Marathon on April 21, 2003 ("Marathon party"). Finally, law enforcement agents observed WALTER deliver a duffel bag to Gary D. NEWELL, a suspected marijuana transporter and money courier, shortly before $221,910.00 in U.S. currency was seized from NEWELL on January 24, 2003.

## DOUGLAS K. BANNERMAN

16. BANNERMAN (a/k/a "Dutch" or "the German") is a United States citizen born in 1958. He is the owner of record of a large, isolated property at 23 Pilgrims Byway, Duxbury,

( 6 )

Massachusetts. His Massachusetts driver's license lists a mailing and residential address of 304 Newbury Street, Apt. 152, Boston, Massachusetts, which is an address for Mailboxes, Etc According to the Postal Service, BANNERMAN also receives mail at 790 Boylston Street, Apartment 17E, Boston, Massachusetts. According to another cooperating witness ("CW-2"), BANNERMAN also maintains a residence in Marina Del Ray, Los Angeles, California, where I believe he spends a good amount of time, based on a review of the activity of prepaid calling cards associated with BANNERMAN.

17.    BANNERMAN's criminal record includes a conviction in November 2000 for possession of marijuana for sale; he was sentenced to one year imprisonment, suspended and three years' probation. As a result of information derived from a wiretap on a telephone used by an individual known as Joaquin Zavala in 2000, BANNERMAN and another individual were observed with others offloading boxes into two hotel units. A search warrant executed at the two rooms resulted in the seizure of 610 pounds of marijuana and approximately $260,000 in cash. I have been advised that BANNERMAN was not intercepted on this wiretap.

18.    Information developed during this investigation, including but not limited to information received from CW-2, has established that BANNERMAN has arranged for numerous shipments of large quantities of marijuana to be delivered to Massachusetts.

19.    Various telephones associated with BANNERMAN have had contact with Target Telephone 1.

## IVAN MORENO-FERNANDEZ

20.    MORENO-FERNANDEZ (a/k/a "Brocco," "Broccoli," "Javier," and "Salvador") is a Mexican national who is a high-level distributor of controlled substances including cocaine and

( 7 )

marijuana. MORENO-FERNANDEZ resides in Mexico and is also believed to spend time in the greater San Diego area, but his current residence is unknown.

21.    MORENO-FERNANDEZ was charged in May 1999 in Del Mar, California in connection with the seizure of approximately 14 grams of marijuana and $3100. The charge was dismissed due to lost paperwork. In May 2000, in Spring Valley, California, DEA seized approximately $11,000 and an ounce of marijuana from him; he was not charged. In February 2002, he was wanted for questioning by San Diego authorities in connection with a murder that took place at his former residence in Spring Valley, California. MORENO-FERNANDEZ no longer uses this residence.

22.    MORENO-FERNANDEZ was one of the targets of a DEA San Diego Title III investigation in 2001 and 2002. Although he was intercepted on numerous occasions engaging in drug related conversations about both cocaine and marijuana, he has not been charged based on that investigation. Beginning in July 2001, MORENO-FERNANDEZ was intercepted over a telephone used by Pedro Alvarez, who was identified as a major source of cocaine and marijuana. The intercepted telephone calls demonstrated that MORENO-FERNANDEZ continued to broker controlled substance transactions involving multiple sources of supply and multiple distributors, including but not limited to Pedro Alvarez.

23.    Although there has been no identified contact between MORENO-FERNANDEZ and the Target Telephone, MORENO-FERNANDEZ is a member of the conspiracy and has had telephone contact with telephones associated with BANNERMAN.

(8)

## GARY D. NEWELL

24.    NEWELL is a U.S. citizen born in 1951.  According to his driver's license, he currently resides at 34637 Devonshire Drive, Eugene, Oregon.  Based on toll record analysis, I believe that NEWELL made a number of calls to (617) 499-1990, BANNERMAN's former voicemail box[1] while he was en route to Massachusetts with what I believe to have been a large load of marijuana for BANNERMAN in January 2003.  After NEWELL reached Massachusetts, on January 24, 2003, law enforcement officers seized $221,910.00 from NEWELL which I believe were drug proceeds.

25.    Although there has been no identified contact between NEWELL and Target Telephone 1, NEWELL is a member of the conspiracy and has had telephone contact with telephones used by BANNERMAN.



26.

27.

_____

[1] BANNERMAN's use of this voicemail box began to wane after the NEWELL seizure on January 24, 2003 and, eventually, on or about June 23, 2003, the box was turned off for nonpayment.

( 9 )



28.

29.

30.

## GARY MILO

31.    Gary MILO is a U.S. citizen, born in 1955. A recent check of RMV records for MILO reveal a listed address of 9 Woodbury Lane, Rockport, Massachusetts.

32.    According to a LEXIS/NEXIS search, a company known as GM Design Building, Inc.. located at 559612 Arbor Club Way, Boca Raton, Florida, lists MILO as the owner of the company.

(10)

33.    According to CW-2, an individual known to it as Gary (and subsequently identified as Gary MILO) is a close associate of BANNERMAN and CLARK in the marijuana trafficking business. CW-2 brokered an approximately 850 pound marijuana sale to BANNERMAN and MILO on one occasion in October 2001; brokered an additional approximately 1200 pound marijuana sale to MILO; and brokered an approximately 500 pound marijuana sale to MILO on a third occasion. MILO advised CW-2 that he has utilized different mechanical/electronic devices in an attempt to detect law enforcement entities that may be investigating his illicit narcotics activities.

34.    A recently debriefed cooperating witness ("CW-4") has stated that it received approximately six to ten multi-pound loads of marijuana from MILO and delivered them to a customer in Massachusetts beginning in or about Fall 2001.

35.    Although there has been no identified contact between MILO and Target Telephone 1, MILO is a member of the conspiracy and has had telephone contact with the telephones of other Targets.



37.



38.

40.

41.

42.

(12)

43. ██████████████████████████████████



## JOHN GRAHAM

44.    GRAHAM is a Canadian citizen and was born in 1961.  The Bureau of Immigration
and Customs Enforcement has informed me that GRAHAM is a resident alien of the United States.
According to NADDIS, in approximately January 1996, he was suspected of money laundering.  A
Massachusetts criminal history check reveals that, among other things, GRAHAM was charged in
March 1986 with possession of a Class B controlled substance (cocaine) in Charlestown District
Court and in December 1999 with possession of a Class B controlled substance in Boston District
Court.

45.    According to CI-1, RINGHAM and GRAHAM are close friends and RINGHAM
supplied cocaine to GRAHAM.

46.    Several telephones associated with GRAHAM have been in contact with Target
Telephone 1.

## JAMES BALDINI

47.    BALDINI is a U.S. citizen and was born in 1966.  RMV records indicate that the
address of James J. BALDINI is 13 Briar Drive, Milford, Massachusetts.  A Massachusetts criminal
record check reveals that, among other things, BALDINI was arrested in 1984 for entering without
breaking and assault and battery.

48.    CW-1 has said that it contacted BALDINI in or about August 2001 when it was trying
to drum up customers for marijuana.  According to CW-1, BALDINI had previously supplied
marijuana to CW-1 that had come from WALTER.  In a subsequent meeting between CW-1 and

(13)

WALTER on May 28, 2003, WALTER made reference to "Jimmy" whom CW-1 later identified as BALDINI.

49.     A telephone subscribed to in BALDINI's name has been in contact with Target Telephone 1.

## WILLIAM C. WRIGHT, III

50.     WRIGHT (a/k/a "Billy") is a U.S. citizen and was born in 1965. In or about June 2003, CW-1, who knows WRIGHT's ex-wife, informed me that WRIGHT used to live in Natick, Massachusetts, but is currently residing in Falmouth, Massachusetts. A Massachusetts criminal record check reveals that, among other things, WRIGHT has been charged with conspiracy to violate the Controlled Substances Act and possession of a Class B controlled substance (cocaine) in 2001, disorderly conduct and assault and battery on a police officer in 1989 and disorderly conduct in 1987. According to CW-1, WRIGHT is a drug user and a former marijuana customer of WALTER who, approximately one year ago, failed to repay WALTER for marijuana that WALTER gave to him on consignment.

51.     (857) 265-5956, a pre-paid, wireless telephone that is subscribed to in the name of Jason Payne, 27 University Road, Brookline, Massachusetts and which WALTER has given CW-1 as another means of contacting him regarding marijuana trafficking, contacted a telephone subscribed to WRIGHT's parents on May 26, 2003.

## III.    OVERVIEW OF THE INVESTIGATION AND ITS GOALS

52.     This is a multi-district investigation conducted by the DEA New England Field Division Boston Office, the Massachusetts State Police, the Boston offices of the Bureau of Immigration and Customs Enforcement and the Internal Revenue Service, and other DEA offices.

(14)

53.    The principle goals of this phase of the investigation include obtaining information regarding (1) the identity of, and admissible evidence against, the individuals involved in the distribution of drugs to the Targets; (2) the manner by which the drugs are transported to Massachusetts; (3) the locations where the drugs are stored prior to distribution; (4) the individuals involved in the distribution of the drugs including customers; (5) the manner by which the drugs are distributed including quantities, prices and locations; (6) the identities of all individuals involved in the collection of drug proceeds; (7) the locations where drug proceeds are being stored as well as the manner by which they are sent back to the sources of supply; and (8) the disposition of drug proceeds.

## IV.    FACTS AND CIRCUMSTANCES

### A.    JANUARY 2003 SUSPECTED MARIJUANA SHIPMENT and MONEY SEIZURE

54.    On January 24, 2003, agents seized $221,910.00 in suspected drug proceeds from Gary NEWELL, who drove from the West Coast to Massachusetts in a truck capable of holding a large quantity of marijuana.

55.    En route to Massachusetts, NEWELL placed a number of calls to (617) 499-1990, the former voicemail box of Target BANNERMAN ("BANNERMAN's former voicemail box") which was capable of receiving incoming telephone calls, but not making outgoing telephone calls. Analysis of trap and trace data and telephone toll records revealed that calls were placed to BANNERMAN's former voicemail box, between January 20, 2003 and January 22, 2003, from a telephone located at a Holiday Inn West in Lakewood, Colorado (where, later determined through hotel records, NEWELL, with a Ford truck with Oregon plates, was registered to stay on January 20, 2003); from another telephone subscribed to by KPV Enterprises, Pilot Travel Center in Boonville,

(15)

Missouri; and from one telephone in Medina, Ohio subscribed to Shue's Service Station. The three locations from which these calls were made are located along a route that one could drive from Southern California to Massachusetts.

56.    During the days leading up to the January 24th money seizure from NEWELL, telephones associated with other Targets were in touch with BANNERMAN.[2] For example, there were calls placed through a prepaid calling card believed to be used by BANNERMAN. These calls included a January 21, 2003 call to (617) 499-4849, a voice mail box believed to be used by Gary MILO and three calls the same day to Target Telephone 1, a telephone subscribed to by WALTER. These calls also included calls to and from ▮▮▮▮▮ Between January 20, 2003 and January 24, 2003, there were multiple contacts between pre-paid calling cards associated with BANNERMAN and various telephones subscribed to ▮▮▮▮▮ to ▮▮▮▮▮▮

57.    Based upon analysis of pen register data on the morning of January 24, 2003, DEA decided to initiate surveillance in the vicinity of the Holiday Inn Express in Cambridge that day. At approximately 9:15 a.m., a DEA agent observed a Ford F-150 pick-up truck, Oregon registration WHZ914, parked in the front parking lot of the Holiday Inn Express. At approximately 9:25 a.m., agents observed a male subsequently identified as NEWELL seated in the truck. From this location, agents followed NEWELL in the truck to the Lechmere Auto Wash, located at 262 Monsignor O'Brien Highway.

58.    There, agents observed a male, subsequently identified as WALTER, exit a white

---

[2]   The trap and trace device on the BANNERMAN voicemail box does not identify the originating number for calls made into the box using prepaid calling cards; information regarding calls into the BANNERMAN voicemail box using prepaid calling cards is derived from an independent review of calling information from prepaid calling cards.

(16)

BMW 540i sedan, Massachusetts registration 916-VXG (registered to Kurt WALTER, 25 Royal Road, Brookline, MA) ("WALTER'S BMW") and walk over to speak with NEWELL outside the Ford truck. Agents further observed NEWELL drive the Ford truck into a self-serve car wash bay and proceed to wash the truck while WALTER walked back and forth several times between WALTER'S BMW and the truck.

59.    At approximately 9:59 a.m., agents observed WALTER take a tan colored duffel type bag from WALTER'S BMW and place it in the front passenger side of the Ford pickup. Agents later observed NEWELL take this bag and place it into the enclosed bed of the Ford truck. At approximately 10:00 a.m., agents observed WALTER exit the parking lot in WALTER'S BMW.

60.    At approximately 10:05 a.m., agents observed another male approach the Ford truck and place something in the rear bed of the truck. This male departed in a black colored Ford Explorer LTD.

61.    At approximately 10:10 a.m., agents observed NEWELL's Ford truck exit the car wash location. DEA agents enlisted the assistance of the Cambridge Police and a marked police car stopped the Ford truck after it had driven through a red light without stopping. The driver produced a license and registration in the name of Gary Dean NEWELL, 34637 Devonshire Drive, Eugene, Oregon.

62.    DEA Task Force Agent Stephen Edwards, who had arrived at the scene, spoke with NEWELL. NEWELL appeared nervous during questioning, gave contradictory responses, hesitated before answering questions and showed noticeable curiosity as to what TFA Edwards was looking at in the rear bed of the truck. TFA Edwards advised NEWELL that he suspected that contraband was contained in two Federal Express boxes (that the agent had observed in the back of truck) or

elsewhere in the truck and asked for permission to look in the vehicle. NEWELL gave him permission and TFA Edwards entered the truck. Upon inquiry about the Federal Express boxes, NEWELL said they contained presents for his girlfriend, but he refused to let TFA Edwards look inside the packages.

63.    A drug detection canine was brought to the scene and had an aggressive reaction to the area of the white plastic bag containing the two Federal Express packages, denoting the presence of a narcotics odor. The dog tore a hole in the side of one of the boxes, through which agents could observe U.S. currency. TFA Edwards asked NEWELL again about the contents of the packages, but NEWELL declined to give an answer. NEWELL was advised that the agents were going to seek a search warrant and that he was free to go. NEWELL gave agents a contact number and was observed walking back to and entering the Holiday Inn Express.

64.    Agents subsequently obtained a search warrant for the truck and its contents. Inside the two Federal Express packages, agents found approximately $218,910 in cash. They also found plastic tarps in the rear bed of the truck which smelled of marijuana. They also found the tan duffel bag that WALTER had placed in the truck earlier that day. It contained clothing, toilet articles and an additional $3,000.

65.    From the bed of NEWELL's truck, a DEA forensic chemist conducted a vacuum search. The material that was collected was sent to the DEA Laboratory for analysis and it has tested positive for the presence of marijuana.

66.    Later, approximately thirty minutes after the truck was towed away and NEWELL was seen returning to the Holiday Inn Express, a call was placed to BANNERMAN's former voicemail box from (617) 629-8566 at 1:01 p.m. Telephone company records indicate that this

(18)