telephone is a pay telephone located at the Osco Drug Store at 14 McGrath Highway, near the Holiday Inn Express where NEWELL had stayed the previous night.

67.    A few days after the January 24th seizure, on January 27, 2003, DEA Task Force Agent Edwards contacted NEWELL who had already returned to Oregon. During the conversation, NEWELL seemed disinterested in retrieving his truck and the cash seized.  He ended the conversation by making reference to planning to contact an attorney.

68.    I believe that NEWELL drove a load of marijuana across country; that the load belonged to BANNERMAN; that NEWELL called BANNERMAN's former voicemail box at various points during his trip to advise BANNERMAN of his progress; that BANNERMAN in turn contacted several other Targets to organize the collection of drug monies; that NEWELL delivered the marijuana prior to the discovery of his whereabouts on the morning of January 24, 2003; that the $221,910.00 seized inside the truck constituted partial payment for the marijuana; that some of the seized money was WALTER's; and that the call to BANNERMAN's former voicemail box from the Osco Drug Store pay telephone was placed by NEWELL for the purpose of advising BANNERMAN of the money seizure.

69.    From the meeting with NEWELL, surveillance agents followed WALTER in WALTER'S BMW to Brookline. There, he was observed not far from 30 Gardner Street, Brookline and 25 Royal Road, Brookline. Both addresses are associated with WALTER: 25 Royal Road is a single-family residence that is the address listed on WALTER's driver's license, the address to which WALTER's vehicle is registered, and the address to which Target Telephone 1 is subscribed. 30 Gardner Street is the subscriber address for a telephone, (617) 277-4117, that is subscribed to in WALTER's name and which has had contact with the Target Telephone. The agents temporarily

(19)

lost sight of WALTER's BMW once arriving in Brookline, but shortly thereafter his vehicle was spotted, parked in the area of 25 Royal Road. Approximately 15 minutes later, WALTER exited 25 Royal Road and was followed to an apartment building at 30 Gardner Street, Brookline, where WALTER parked in front. One surveillance agent passed by his vehicle and observed him on the telephone. Shortly thereafter, surveillance observed WALTER'S BMW to be unoccupied. At or about noon time, agents observed WALTER exit 30 Gardner Street, get into his vehicle and drive away in the direction of Royal Road. Two minutes later, agents observed WALTER'S BMW parked near 25 Royal Road. Later on January 24th, after surveillance of WALTER terminated, my co-case agent did a visual inspection of 30 Gardner Street and observed the name WALTER on the registry for Apartment 2C.

## B.    INFORMATION FROM CONFIDENTIAL SOURCES

### 1.    Information for CI-1

70.    I, along with my co-case agent, have recently interviewed CI-1 who does not wish to testify in this case. This informant, who has no pending criminal charges, came forward to law enforcement and volunteered information regarding the drug trafficking activities of approximately twelve individuals. CI-1 had a close personal relationship with one of the Targets, but not WALTER. CI-1 had obtained numerous restraining orders against this individual between November 1997 and July 2001 and was the victim of numerous violations of the restraining orders and assaults by this individual. CI-1 stated that it knew, based on direct knowledge, that WALTER has been a marijuana trafficker for a number of years.

71.    On May 6, 2003, I, along with my co-case agent, met with CI-1 and showed it the surveillance photographs of WALTER's April 21, 2003 Marathon party. Upon review of these

photographs, CI-1 identified ████████ During this session, I did not specifically ask about WALTER in the surveillance photographs because it had previously identified WALTER and other associates. CI-1 also identified various other attendees at the party.

72.    During one of our debriefings, CI-1 was shown a series of approximately ten Massachusetts driver's license photographs with no identifying information. CI-1 identified a photograph of BANNERMAN as "Douglas" who is a close friend to WALTER and ████████ It reported that, among other things, during the 1990s, "Douglas" lived in the Prudential Building in Boston. Through CI-1's association with another Target, it learned that BANNERMAN would sell cocaine and marijuana and also buy drugs from ████████ nd others.

73.    On or about May 6, 2003, CI-1 told me that WALTER had a cellular telephone number which it believed began (617) 901. CI-1 said that it would review old cellular telephone records that were in its possession to recall the complete number. Later that day, CI-1 reviewed the records and indicated that the full number was (617) 901-0104, Target Telephone 1. CI-1 further stated that it was present in the past when ████████ would talk to WALTER on Target Telephone 1 about facilitating drug deals.

a.    **Information from CI-1 Regarding WALTER's Marathon Party and Subsequent Surveillance There**

74.    CI-1 informed me that WALTER hosts an annual party along the Boston Marathon route. WALTER held this party this year on Boston Marathon Day, April 21, 2003, along the Marathon route, on the North side of Beacon Street in Brookline, Massachusetts, just a short distance east of Washington Square. The party was set up in a cordoned off section of parking spaces between Beacon Street and the tracks for the MBTA T-stop. My co-case agent and I, with the

(21)

assistance of a confidential informant ("CI-2").[3] conducted surveillance of WALTER and other participants at the Marathon party between 10:30 a.m. and 2:30 p.m. CI-2 was able to stand along aside the cordoned off area of the party and, eventually, was able to make small talk with WALTER and other attendees at the party. My co-case agent and I were on foot and, throughout the surveillance, changed locations intermittently between locations east and west of the party. During this surveillance, I took photographs of the participants at this party.

75.    During this surveillance, we observed several vehicles arrive including but not limited to vehicles registered to attendees at the Marathon party. Later during this surveillance, I observed CI-2 meet with WALTER and several other individuals at the Marathon party. I also observed WALTER using a wireless telephone that, as discussed below, was subsequently identified as Target Telephone 1.

76.    As CI-2 was getting ready to leave the area of the Marathon party (and as directed by me), CI-2 told WALTER that it owned a limousine service and that it wanted to take WALTER and his girlfriend out for a night on the town in the limousine to thank him for his hospitality at the party. (After assisting with moving a portable toilet away from the cordoned area of the Marathon party, WALTER had given CI-2 food and drink). WALTER appeared happy about the prospect of a limousine ride and he hugged CI-2. CI-2 asked WALTER for his telephone number but WALTER said he does not give it out. WALTER told CI-2 to leave its telephone number with his girlfriend which it did.

---

[3]For reasons that are discussed more fully later in this affidavit, I am not relying upon CI-2's statements and observations of this Party for probable cause, but for completeness of the account of the surveillance of the Marathon Party.

(22)

## 2. Information from CW-1

77.    CW-1 recently came to the attention of the Boston Field Office of DEA as a result of a multi-state, wiretap investigation, led by the DEA Medford Resident Office in Medford, Oregon, that targeted a marijuana trafficking organization. In the course of a wiretap on telephones used by CW-1's cousin in December 2002 and January 2003, several calls between CW-1 and its cousin were intercepted. The Oregon wiretap investigation did not reveal any information regarding the Targets in this investigation. At the request of the DEA Medford Resident Office, the Boston Field Office sought and received a search warrant to search CW-1's residence in Natick, Massachusetts for various categories of documents relating to marijuana trafficking; items of paraphernalia used to break up and package quantities of marijuana for resale; and documents reflecting CW-1's ownership and/or occupancy of its residence. Law enforcement agents executed this search warrant on CW-1's residence on May 13, 2003 and seized various documents and items (including but not limited to an electronic scale, baggies, pipe and a small quantity of marijuana) relating to drug trafficking and CW-1's occupancy there.

78.    CW-1 has not yet been charged in connection with the marijuana trafficking conspiracy in Oregon or elsewhere. However, based upon conversations between the U.S. Attorney's Office in Boston and the U.S. Attorney's Office in the District of Oregon, I understand that CW-1 will likely be charged in participation in a conspiracy to distribute marijuana in violation of Title 21, United States Code, Section 846 in the District of Oregon. I also understand that its cooperation in connection with the Massachusetts investigation will be considered in connection with the government's recommendation for disposition in the District of Oregon matter. I also understand that there are currently no plans to charge CW-1 with separate charges in the District of

(23)

Massachusetts.

79.    CW-1 has previously been convicted in 1987 for two counts of distribution of a Class D controlled substance (marijuana) and conspiracy to violate the Controlled Substances Act. CW-1 also was convicted in 1989 in Framingham District Court for possession of marijuana with intent to distribute and distribution of a Class D substance (marijuana) and possession with intent to distribute a Class B controlled substance (cocaine) and conspiracy to violate the Controlled Substances Act.

80.    The following information was provided by CW-1 to my co-case agent. In August 2001, its cousin from Oregon asked if CW-1 could sell twenty-pound to thirty-pound quantities of marijuana. Although CW-1 initially indicated that it did not know anyone who would purchase that large an amount of marijuana, CW-1 later approached a friend whose husband, James BALDINI, had been involved in marijuana trafficking approximately ten years ago.

81.    According to CW-1, BALDINI had previously dealt with a marijuana trafficker named "CORT", who has now been identified as WALTER. CW-1 further stated that BALDINI had previously supplied it with marijuana that BALDINI had received from WALTER. In fact, CW-1's convictions for distribution of marijuana and cocaine in 1987 and 1989 involved marijuana that had been supplied by WALTER.

82.    In September 2001, CW-1 was holding approximately twenty-five pounds of marijuana that it had received from its cousin. During the first week in September 2001, BALDINI telephoned WALTER from CW-1's residence and gave WALTER CW-1's contact telephone numbers. Subsequently, WALTER went to CW-1's residence and took one block of marijuana which weighed approximately two pounds. Approximately one week later, WALTER returned to

(24)

CW-1's residence and took the remainder of the twenty-five pounds of marijuana.

83.    After this first transaction with WALTER in September 2001, CW-1 would supply WALTER with marijuana from each of the shipments that it received from its cousin every six weeks or so. CW-1 gave quantities of marijuana to WALTER that ranged from twenty-five to fifty pound quantities. CW-1 estimated that it supplied WALTER on another eight occasions after their first September 2001 deal.

84.    On January 23, 2003, CW-1's cousin was stopped by the New York State Police en route to Massachusetts. The police seized approximately 75 pounds of marijuana and $121,930 in cash from him, but CW-1's cousin, for strategic reasons, was not arrested. As result of this seizure, CW-1's cousin stopped supplying CW-1 with marijuana.

85.    Sometime shortly after the January 23, 2003 seizure from CW-1's cousin, WALTER contacted CW-1 inquiring about more marijuana. CW-1 did not initially tell WALTER about the marijuana seizure from the cousin and that being the cause of it having not received additional marijuana. Instead, CW-1 told WALTER that its source was not happy with the quality of the marijuana for sale and that he was having a problem with his drivers.

86.    During the January 2003 conversation, WALTER told CW-1 that he could supply marijuana to CW-1. In or about February 2003, WALTER "fronted" (i.e., gave without immediate payment) sixty pounds of poor quality marijuana to CW-1. CW-1 wanted this marijuana because it had a customer who wanted fifty pounds of marijuana. The customer took two pounds of it on consignment. Two days later, the customer took only another twenty-three pounds because he was not happy with the quality of the two-pound sample.

87.    Given the customer's unwillingness to take additional marijuana, CW-1 asked

(25)

WALTER to take twenty-five pounds back, but WALTER told it to attempt to sell it. CW-1 responded that there was one customer who could take twenty-five pounds, but he was slow to pay back CW-1 for the marijuana. WALTER agreed that CW-1 should take the chance and give it to this customer, Mohamed Ash-Fouad (a/k/a "The Egyptian" or "Alex") on consignment.

88.     In or about February 2003, CW-1 gave the twenty-five pounds of marijuana to Ash-Fouad on consignment. Ash-Fouad owed CW-1 $26,500 for this marijuana. Subsequently, during various meetings and telephone conversations, Ash-Fouad refused to pay CW-1 for the twenty-five pounds of marijuana. Eventually, WALTER began to pressure CW-1 for the money that Ash-Fouad owed for the twenty-five pounds of marijuana. CW-1 told WALTER that it was turning the debt collection matter over to WALTER. To this end and at WALTER's direction, CW-1 subsequently took photographs of Ash-Fouad, his house in Wayland and his car and gave them to WALTER. CW-1 also gave WALTER the key to Ash-Fouad's black BMW that Ash-Fouad had previously left at CW-1's residence.

89.     After CW-1 had handed the Ash-Fouad money collection matter over to WALTER, a male who identified himself only as "Scott" called CW-1. "Scott" said that he was a friend of WALTER's. CW-1 gave all the information that it had on Ash-Fouad to "Scott." "Scott" instructed CW-1 that it should not contact Ash-Fouad anymore about the money owed and said that the matter was not in CW-1's hands any longer. Since this telephone call, CW-1 has not heard from "Scott."

90.     CW-1 distributed the remaining ten pounds from the sixty-pound quantity of marijuana that it had received from WALTER in or about February 2003 to local customers. Even though CW-1 owed WALTER money for the February 2003 delivery of marijuana, WALTER still gave additional marijuana to CW-1 on consignment. In April 2003, WALTER provided four to five

-26-

more pounds of marijuana to CW-1 which CW-1 then gave to local customers in Massachusetts on consignment. CW-1 paid WALTER for this marijuana during the week of May 5, 2003. At the time of this payment in early May 2003, CW-1 still owed WALTER $7,000 for the ten pounds of the 60-pound quantity that WALTER had supplied in February 2003. WALTER told CW-1 that he was continuing to supply it with marijuana so CW-1 could pay back $1,000 or $2,000 each time toward the outstanding $7,000 debt. WALTER gave six and one-half pounds of high-grade marijuana to CW-1 at this time, which in turn CW-1 distributed to various customers in the area.

91.    CW-1 knew WALTER to use two cellular telephones to facilitate his drug trafficking activities. The first telephone is Target Telephone 1. WALTER has used Target Telephone 1 for as long as CW-1 had been dealing with him directly. More recently, WALTER has also been using (857) 265-5956, a pre-paid wireless telephone subscribed to in the name of Jason Payne, 27 University Road, Brookline ("WALTER's second wireless telephone"). WALTER instructed CW-1 to call him on WALTER's second wireless telephone, but at times the phone was not on and CW-1 would still call Target Telephone 1 to discuss marijuana transactions with WALTER.

92.    In late January 2003 or early February 2003, WALTER told CW-1 that a friend of his had a guy in Boston who was pulled over by law enforcement agents and the DEA seized approximately $100,000 from the guy. WALTER eventually consulted an attorney to look into "his friend's" seized money. WALTER asked CW-1 a lot of questions about the situation with the law enforcement seizure from its cousin's operation. Specifically, WALTER wanted to know what its cousin had done to retrieve the money and if he was able to get the money back. Based upon these statements and subsequent statements that WALTER made to CW-1, I believe that WALTER was referring to the January 24th money seizure from NEWELL.

(27)

3.    Consensually Monitored Calls by CW-1 to WALTER on Target
      Telephone 1 in May 2003

93.    CW-1 agreed to cooperate with DEA and collect the money from its customers and make payments to WALTER while under supervision and control by DEA. In the course of the following paragraphs, I have summarized, not listed a verbatim account of, the substance of those telephone calls as well as consensually monitored, in-person meetings between CW-1 and WALTER. Where interpretation of coded language is necessary, I have put my interpretation, based upon subsequent conversations with CW-1 and my training and experience, in parentheses. Unless otherwise noted, the telephone calls (or telephone voicemail messages) and in-person meetings were recorded.

94.    On Wednesday, May 14, 2003, at approximately 4:55 p.m., CW-1 placed a telephone call to WALTER (a/k/a "CORT") at Target Telephone 1. First, CW-1 explained that it was still "here" (meaning, the hospital where it was recuperating from surgery) and would be there for another night. CW-1 and WALTER talked about a schedule for CW-1 to meet with WALTER and give him the drug monies that it owed him. CW-1 spoke about needing until Friday to get "the paperwork together" (meaning collecting drug proceeds). CW-1 further said that it would have most of it by Saturday, but might need until Monday to get the rest of it (money). Walter asked did CW-1 mean "that" plus "the extra" (meaning money toward CW-1's outstanding debt on past quantities of marijuana). CW-1 said just "the extra." WALTER said that he needed "the extra", but why didn't they just play it by ear because CW-1 was going to start to feel better anyway and he did not know how its "schedule" is. Once WALTER clarified that "schedule" was code for how much marijuana CW-1 still had, CW-1 responded that it "had nothing to hand out." They agreed to talk the following day.

(28)

95.    Although CW-1 and WALTER agreed to talk the next day, May 15, 2003, they did not do so because CW-1 was unable to reach WALTER by telephone.

96.    On Friday, May 16, 2003, at approximately 11:18 a.m., CW-1 placed another telephone call to WALTER, but this time to WALTER's second wireless telephone. (I note that the middle portion of the conversation was not recorded as the cassette tape was changed during the call.) During this call, CW-1 and WALTER initially talked about WALTER's mother who was terminally ill. WALTER then stated he wasn't going to have a chance to "do that." WALTER said he would come to CW-1's house. They agreed that WALTER would call over the weekend and that he would call CW-1 on its cell phone. WALTER reminded CW-1 that "you still got to get that other thing; remember we talked about it; you still gotta get your other thing" (referring to CW-1 retrieving a pre-paid telephone that it had lent to someone else). WALTER ended the conversation saying he would call CW-1 the following day (May 17, 2003).

97.    On Saturday, May 17, 2003, at approximately 4:31 p.m., WALTER, using an unidentified telephone, left a message on CW-1's voicemail advising it that he would not be able to see CW-1 for a few days because his mother had passed away.

98.    While awaiting further contact with WALTER, CW-1, under the direction and/or supervision of DEA, went about collecting monies owed to it for marijuana it had received from WALTER. CW-1 had previously provided DEA with $4300 in monies that it had already collected for marijuana that it had distributed from the quantities that it had received from WALTER. On May 19, 2003, CW-1 had several telephone conversations with Donnie Bowden, a marijuana customer. As a result of these conversations, Bowden agreed to leave $3600, the amount that Bowden owed CW-1 for marijuana, in the glove box of CW-1's vehicle at CW-1's residence (as CW-1 had

(29)

instructed him to do and as he had done in the past) that night. The following day, May 20, 2003, CW-1 gave my co-case agent $3600 that was inside a white ATM deposit envelope with silver duct tape sealing it. CW-1 reported that this had been left in the glove compartment of its vehicle in the driveway of its residence by Bowden.

99.    On May 21, 2003, at approximately 11:55 a.m., CW-1 again contacted WALTER on Target Telephone 1. CW-1 offered regrets to WALTER about his mother's death. WALTER said that he would call CW-1 later. CW-1 called WALTER again on Target Telephone 1 at 2:05 p.m., but WALTER said that he would call right back. Soon thereafter, at approximately 2:10 p.m., the two spoke again. WALTER asked CW-1 again about the money that it owed him. CW-1 replied that it got what they had talked about (meaning the amount of money). During this conversation, CW-1 said that it wanted "about five hours" on that "project" (meaning it wanted five pounds of marijuana). CW-1 further explained that it would "tack 3" onto each one and turn it around to you, "the whole 15" (meaning it would pay an extra $300 on each of the five pounds for a total of $1500 against its drug debt to WALTER). The two agreed that WALTER would call later to set up a time for tomorrow. In another call to Target Telephone 1, at approximately 5:15 p.m., CW-1 called to check with WALTER about meeting the next day. WALTER said he was trying to "organize" something and would call the next day.

4.    **Controlled Meets Between CW-1 and WALTER for Exchange of Drug Proceeds and Marijuana in May and June 2003**

**May 22, 2003 CW-1 Meet with WALTER to Deliver Drug Proceeds and Receive Additional Marijuana**

100.    On May 22, 2003, at approximately 9:00 a.m., I, along with other law enforcement agents, initiated surveillance at three addresses associated with WALTER--25 Royal Road,

(30)

Brookline; 30 Gardner Street, Brookline and 140 K Street, South Boston. Massachusetts--as well as at CW-1's residence.

101.    I, along with my co-case agent and two Natick Police Department detectives and one Massachusetts State Police Sergeant, met with CW-1 at its residence. We set up an audio-video surveillance device and a separate audio recording device in the kitchen. The audio/video device not only recorded, but also transmitted audio and video of the subsequent meeting between CW-1 and WALTER to me and the other law enforcement officers who would be in a bedroom upstairs during the meet. (Due to technical difficulties, the video equipment only captured the audio portion of the meeting and not a discernable video portion. However, I, along with the other law enforcement agents present, was able to monitor this meeting contemporaneously via the video receiver).

102.    At approximately 9:30 a.m., I, along with my co-case agent, provided CW-1 with $6500 cash to give WALTER during this meeting as a partial payment for marijuana that WALTER had previously provided. Although WALTER was expecting to receive $9500 from CW-1 at this time, my co-case agent and I decided that CW-1 would give WALTER only a portion of this money, $6500.

103.    Since we were going to be monitoring the meeting and because there was no female law enforcement officer present, we did not search CW-1 for excessive cash, contraband or weapons before its meeting with WALTER. (We, however, did not observe any of these items on CW-1's person). Unless otherwise noted, the following description of this meeting is based upon my contemporaneous viewing of and listening to the meeting between CW-1 and WALTER via the audio/video monitor, a debriefing of CW-1 (immediately) after the meeting with WALTER and my review of the audio recordings of the meeting.

(31)

104.   At approximately 9:30 a.m., DEA TFA Shaun Santos observed WALTER'S BMW parked in the garage at 30 Gardner Road, Brookline.

105.   At approximately 10:06 a.m., CW-1 contacted WALTER on WALTER's second wireless telephone. During this phone call, WALTER responded that he was already on the road and would be there (at CW-1's residence) in about fifteen minutes.

106.   At approximately 10:20 a.m., Massachusetts State Police Sgt. John M. Brooks, who was positioned upstairs in a separate bedroom with a view of the driveway, observed WALTER arrive in WALTER'S BMW.

107.   Upon entering the residence, WALTER placed a brown Filene's shopping bag on a chair at the kitchen table. This bag contained a box that was wrapped in red gift paper. (The contents of this box, after field testing and weighing, was later determined to be approximately five pounds of marijuana).

108.   During this meeting, WALTER told CW-1 that he had broken the five pounds (of marijuana) down (i.e., that he had broken the five pounds down into one-pound increments). CW-1 told WALTER that it only had $6500 for him, not the previously agreed upon $9500. CW-1 then handed WALTER the $6500 in a white envelope. WALTER placed this money in his coat pocket and asked CW-1 where the remaining monies were. CW-1 advised WALTER (as it had been directed to do by my co-case agent) that it did not have the remaining monies and told WALTER it should have it for him on Friday (5-23-03) or Tuesday (5-27-03). After some discussion about what was owed, WALTER agreed with this schedule.

109.   WALTER told CW-1 that he needed the information about "the Egyptian" (meaning Mohamed Ash-Fouad), the person who owed CW-1 for WALTER's marijuana. CW-1 provided

WALTER with Ash-Fouad's address and the name and address of his pizza shop. WALTER told CW-1 that he was going to send somebody by there. Later during the meeting, WALTER asked for Ash-Fouad's name and wrote it down when CW-1 provided it.

110.    Referring to the brown bag that WALTER had brought, CW-1 asked WALTER what he had given it. When WALTER replied "five," CW-1 said that was exactly what it wanted. CW-1 then asked WALTER if it was "fluffed." WALTER replied that it is all "fluffed." (Based upon training and experience and discussion with CW-1, I understand "fluffed" to be a term referring to the process of converting dense or compressed marijuana bricks into expanded or fluffed marijuana by microwaving them).

111.    WALTER then brought up Ash-Fouad again and told CW-1 that "Jimmy" (BALDINI) said that WALTER should not do anything (to collect the debt) because Ash-Fouad had a gun. CW-1 confirmed to WALTER that he (Ash-Fouad) owned a gun. WALTER advised that if Ash-Fouad wants to go that way about things then he (WALTER) is going to send these guys to speak with him. CW-1 said that Ash-Fouad is "psycho." WALTER then said let's see "psycho" with the two guys who just got out of the pen (the penitentiary or prison). WALTER told CW-1 that once CW-1 and WALTER got clear (on the monies owed), WALTER was going to call a friend of his who works at the State Department and drop a dime on Ash-Fouad by fabricating a story about Ash-Fouad being a terrorist.

112.    WALTER further told CW-1 that he would be taking off soon for two weeks. WALTER asked CW-1 if it would have these (meaning the five pounds of marijuana) done in a week or two weeks. CW-1 told him it would be done in a week or ten days.

113.    WALTER then told CW-1 to get that (meaning the five pounds of marijuana) out of

(33)

its kitchen because it stunk and to use cleaning gloves when handling this marijuana and that no one had touched this marijuana without gloves.

114.    At approximately 10:30 a.m., I observed, via the audio video monitor, WALTER depart the residence. A few seconds later, Sgt. Brooks, observed WALTER depart CW-1's driveway in WALTER'S BMW.

115.    DEA Task Force Agent Santos, who was still positioned on surveillance at WALTER's 30 Gardner Street address in Brookline, observed WALTER (in WALTER'S BMW) drive past him on Gardner Street at approximately 10:57 a.m. The agent then saw WALTER turn onto Washington Street and enter the parking garage at 30 Gardner Street.

116.    On May 26, 2003, at approximately 11:29 a.m., WALTER, using WALTER's second wireless telephone, left a message for CW-1 on its cellular telephone to confirm their next meeting. He said that they should meet "down where I like to do my shopping for literature" (meaning the Barnes & Noble bookstore near the Chestnut Hill mall). Later that day, at approximately 7:57 p.m., CW-1 left a voicemail message on WALTER's second wireless telephone asking WALTER to give it a call.

117.    The following day, Tuesday, May 27, 2003, at or about 12:44 p.m., WALTER, using WALTER's second wireless telephone, left a message on CW-1's voicemail. WALTER apologized for not getting CW-1's earlier call and asked it to call him back. On May 27, 2003, at or about 2:15 p.m., CW-1 called WALTER back on Target Telephone 1. WALTER pleaded with CW-1 for the remainder of the money that it owed him. During the conversation, WALTER explained that he needed as much money as possible for a restaurant venture. The two agreed to meet the following morning. CW-1 suggested that they might meet for coffee, but WALTER said that he might be

(34)

taking a ride out CW-1's way anyway for a slice of pizza. (CW-1 later explained that this is a reference to checking out Goody's Pizza in Framingham which is owned by Ash-Fouad). WALTER told CW-1 that he would call later and leave a message on its voicemail. WALTER then told CW-1 to "get the other thing from those people." CW-1 later explained "thing" was another reference to the pre-paid cellular telephone that CW-1 had loaned to an acquaintance. WALTER wanted CW-1 to use that telephone when they were talking about drug transactions to evade law enforcement detection.

118.    CW-1 called WALTER on Target Telephone 1 again on May 27, 2003, at or about 4:20 p.m. During this call, CW-1 told WALTER that its car was not going to be out of the shop in time for it to meet WALTER. CW-1 asked WALTER to meet at its residence. WALTER responded that he might be busy tomorrow and would call CW-1 later.

## May 28, 2003 CW-1 Meet with WALTER to Deliver Drug Proceeds

119.    On May 28, 2003, at approximately 9:20 a.m., I, along with my co-case agent, another DEA agent and Natick Police Department detectives went to CW-1's residence. In our presence, CW-1 tried unsuccessfully to contact WALTER on his two cellular telephones, Target Telephone 1 and WALTER's second wireless telephone, on multiple occasions. However, at approximately 9:25 a.m., CW-1 was able to leave a message on the voicemail of Target Telephone 1 asking WALTER to call it. CW-1 finally reached WALTER live on Target Telephone 1 at approximately 11:15 a.m. In this conversation, WALTER said that he would have to get back to CW-1 because he was in a meeting. CW-1 replied that it "had the house cleared for a couple hours" (meaning that they could meet at its residence). WALTER said that he would call CW-1 back. At approximately 11:35 a.m., CW-1 called WALTER again on Target Telephone 1, but WALTER reported that he was still

(35)

in a meeting. During this call, CW-1 explained repeatedly that it only had another hour available at the house (in which to meet WALTER). WALTER said that he would call it back.

120.    Shortly thereafter, WALTER, using WALTER's second wireless telephone, called CW-1. If they couldn't meet that day, WALTER asked if CW-1 could meet him for coffee the next day. CW-1 explained that it still did not have its car back and would have difficulty getting a ride to meet WALTER. CW-1 further explained that it "(didn't) want to hang onto this money" because it had a problem spending money. WALTER finally agreed to "shoot up there" (to CW's residence). When CW-1 asked when WALTER was coming, he replied that he was leaving now, he was getting on the (Mass.) Pike and would be there in about half an hour.

121.    At CW-1's residence, we had again installed an audio/video device and a separate audio micro-recorder unit in the kitchen area as we had done on May 22, 2003.

122.    DEA Special Agent Nancy Morelli, a female agent present, then searched CW-1 and found that it had no contraband, weapons and/or excessive cash on its person. My co-case agent and I gave CW-1 $3000 cash to give to WALTER as an additional payment for marijuana that WALTER had previously given CW-1. I observed CW-1 place the $3000 in a white envelope and then place the envelope inside a kitchen cabinet next to the sink. I, along with other law enforcement officers, went to the upstairs bedroom to await WALTER's arrival and monitor the recording equipment.

123.    Although no agents were present during the meeting, I, along with other law enforcement agents, monitored the meeting via the video and audio transmissions. Unless otherwise noted, the following description of this meeting is based upon my contemporaneous viewing of and listening to the meeting between CW-1 and WALTER via the video/audio monitor, a debriefing of CW-1 (immediately) after the meeting with WALTER and my review of the audio and video

(36)

recordings of the meeting.

124.    Earlier that morning at approximately 9 a.m., a surveillance agent observed that WALTER'S BMW was parked in the garage complex at 30 Gardner Street, Brookline.

125.    At approximately 12:20 p.m., WALTER arrived in WALTER'S BMW and entered CW-1's residence. WALTER kidded CW-1 about having a problem spending money. (This was a reference to CW-1's explanation to WALTER in the earlier telephone conversation to get him to come to its residence to collect the money that day). CW-1 went to the kitchen cabinet next to the sink, retrieved the white envelope (containing $3000) and slid it across the kitchen table to WALTER. WALTER took the envelope and put it in his back pocket without counting it.

126.    WALTER said he needed to raise "50 grand" in a week because he was buying a Chinese restaurant in Newton Centre named Sally Ling's. After some discussion about the restaurant and then WALTER's family, CW-1 asked WALTER what would be done to retrieve the drug debt from Ash-Fouad. WALTER said that he didn't know what the guys were going to do (to retrieve the money), but, at this point, WALTER didn't care. CW-1 told WALTER that it was concerned about what they are going to do because "that's going to come back on me" (meaning that any harm that came to Ash-Fouad would be tracked back to it because of the outstanding debt). (We had instructed CW-1 to say this to WALTER in an attempt to dissuade him from taking any violent action against Ash-Fouad and to gather more information about WALTER's intentions toward Ash-Fouad).[4] WALTER replied that they won't do him in; "he's just going to get pushed really hard."

_____

[4] note that DEA has taken steps to advise Ash-Fouad of the potential threat against him. DEA, through CW-1, has made continuing efforts to contact Ash-Fouad directly about this matter. Specifically, DEA has had CW-1 make several attempts to contact Ash-Fouad at various telephone numbers associated with him. When CW-1's attempts to reach Ash-Fouad were
(continued...)

127. After some discussion about the possibility that Ash-Fouad might pull a gun on one of WALTER's guys (that is, in defense to WALTER's guys approaching him), WALTER explained that one of his guys was waiting for two more weeks for the second guy to get off parole (after having served ten years in prison). While he had been in prison, WALTER had sent him money for the commissary once a month and so the guy did not care if he has to go right back to jail.

128. WALTER suggested to CW-1 that it call Ash-Fouad once more, but CW-1 responded that it had done that before. WALTER told CW-1 just to keep tabs on Ash-Fouad. CW-1 asked WALTER if he had been by any of the addresses for Ash-Fouad that CW-1 had supplied and WALTER replied, no that he (meaning, Scott) did not want him to. CW-1 stated that "Scott" had told CW-1 the same thing.

129. In regard to Ash-Fouad, WALTER also stated that he had a "buddy" whose brother is the Deputy Director of Homeland Security. According to WALTER, this buddy told his brother about suspicious Arabs all the time. According to WALTER, this buddy said just give him Ash-Fouad's name and he'll make his life so miserable. WALTER then added, "but you know that's bad, it's bad karma."

130. During the May 28th meeting, WALTER asked CW-1 if it could come up with any "extra" (money) because he was "scrambling" (to scrape together money for the restaurant). WALTER mentioned he was selling all of his stock and had already cleaned out one bank account. He said that he should be getting a lot of money from his sister, but his sister is not going to budge

---

:(...continued)
unsuccessful, CW-1, at DEA's direction, contacted a close relative of Ash-Fouad and explained to him that two individuals were looking for Ash-Fouad because he owed CW-1 money. (For strategic reasons, I instructed CW-1 not to mention WALTER's name and it did not). This close relative subsequently advised CW-1 that he had passed its message along to Ash-Fouad.

(38)

until the estate (of his recently deceased mother) goes to probate  WALTER mentioned that his mother had planned on taking a $25,000 home equity loan (to give WALTER funds toward the restaurant purchase), but his sister had said, no, she was not going to do it.  WALTER said that he knew CW-1 was trying (to collect drug proceeds), but asked if there was anything else it could do; if it could scrape an extra thousand here or there.  WALTER said he had "25" (meaning $25,000), but he had to come up with another "25" (meaning another $25,000).  WALTER then stated "all this wouldn't have happened if this fucking little scumbag hadn't done this."  CW-1 later explained that this was another reference to Ash-Fouad and his drug debt.

131.    WALTER told CW-1 that they would "put him (Ash-Fouad) to sleep" (meaning, they would let him get comfortable by making him think the drug debt was forgotten).  After some discussion about where Ash-Fouad had recently been seen, CW-1 explained that it thought that Ash-Fouad thinks that the money was due to CW-1's cousin (out of town) and was not owed to anyone locally.  In regard to the guys that WALTER was directing to contact Ash-Fouad, CW-1 asked WALTER if the name of the guy who had called CW-1 about this matter was really "Scott." WALTER replied, "it's his real name," but then quickly added "you don't know his real name, forget his name and don't call him at that number, 437-84(inaudible),[5] don't call any numbers (for him)." WALTER further said that he explained that this guy (Scott) didn't scare easily; he used to rob drug houses when he was out (of prison) before.  WALTER said that when he told this guy that Ash-Fouad might have a gun, the guy was not concerned.

132.    During this meeting, CW-1 and WALTER also talked about WALTER's oriental rug

---

[5]I could not hear the last two digits of this number clearly.  I note, however, that there is a similar telephone number, (617) 437-8422, subscribed to by Michelle Sadler, 405 Columbus Avenue, Apartment 603, Boston, MA, that is in frequent contact with the Target Telephone.

business. CW-1 later explained that WALTER's oriental rug business is a business that WALTER was involved in located on Speen Street in Natick, Massachusetts, directly across from the EZ Mini-Storage facility, the same one to which a load of marijuana had been delivered in December 2001 and the same one at which CLARK is currently maintaining storage space and receiving packages of items that could be consistent with items used in the packaging of controlled substances.

133.    After some discussion about antiques in CW-1's residence, WALTER announced that he had to leave. Before leaving, however, WALTER mentioned that "he's got some other things and I actually seen him this morning. He has got some other things and they're doing another thing and he's going to give me a look." WALTER further stated that he was going to continue to work "these", but "I am going to give you a piece." WALTER added that "I still had that other one that I am going to return to him." "He has some other things, more to your liking, that you'll be able to go to him with." He reiterated that he was going to continue working "these little ones" because they are the perfect size to store. CW-1 later explained that "he" was WALTER's marijuana source and "the thing" that would be more to its liking was a new kind of commercial grade marijuana.

134.    CW-1 asked if WALTER needed "that thing" (meaning a metal lockbox which WALTER had asked to borrow to use to store marijuana). WALTER responded that he would collect it "with his buddy with a truck."

135.    As WALTER departed, he told CW-1 to forget about the guys that he was directing to collect the money from Ash-Fouad. CW-1 (playing along) replied "I don't know who you're talking about." WALTER instructed CW-1 to keep tabs on him (Ash-Fouad) by seeing if his car has moved, but "don't go down (there)." WALTER said that he would be in touch and then departed the residence at approximately 12:33 p.m. After WALTER's departure, DEA Special Agent Morelli

( 40 )

again searched CW-1 for contraband, weapons and/or excessive cash with negative results.

136.    At approximately 1:03 p.m., a surveillance agent set up in the area of 30 Gardner Street, Brookline, observed WALTER'S BMW enter the 30 Gardner Street garage complex.

## June 12, 2003 CW-1 Meet with WALTER to Deliver Drug Proceeds and Receive A Marijuana Sample

137.    On Wednesday, June 4, 2003, at approximately 9:50 a.m., CW-1 called WALTER at Target Telephone 1. CW-1 told WALTER that it had "three and a half pages" (S3500) for him. They agreed to meet the following morning around Route 9. WALTER said that he had to see someone to get something more readable for CW-1 (sample of commercial grade marijuana). CW-1 indicated that it was in no rush because "this is going slow" (meaning that it was taking awhile to distribute the last five pounds WALTER had given it). CW-1 said that it would call him later that evening. In the course of this conversation, WALTER said he was not going away on his trip because he had invested all of his money in the restaurant venture (Sally Ling's). In a later call to Target Telephone 1 that day, at approximately 8:10 p.m., CW-1 and WALTER agreed to meet at around 1 to 1:15 p.m. the next day. WALTER said that he should be able to make this meeting, but indicated that he was very busy with other matters. WALTER said that they should meet "where we usually are" (meaning the Barnes & Noble Bookstore on Route 9 near the Chestnut Hill mall). The next day, June 5, 2003, I, along with other law enforcement agents met with CW-1 in the area of Chestnut Hill in anticipation of the meeting that CW-1 and WALTER planned to have later that day. Shortly before their planned meeting, at or about 12:44 p.m., CW-1 (in the presence of my co-case agent and me) received a call from WALTER. (Due to a technical error, only CW-1's end of the conversation was recorded). WALTER said that he had just gotten up, had a hangover and was not at home. CW-1 said it would stay in the area (of Chestnut Hill). At approximately 1:50 p.m., CW-1

(41)

called WALTER on WALTER's second wireless telephone and left him a message that it would wait around for another ten to fifteen minutes and asked WALTER to call it. Receiving no response, CW-1 called WALTER again at 2:05 p.m. on Target Telephone 1 and left a message indicating that it couldn't wait any longer for WALTER. CW-1 said that it would put "these three and a half pages in the bank because I can't have it around my house" (it would put the $3500 in the bank so it wouldn't spend it). CW-1 said it would have to see WALTER the next week unless it heard from WALTER within two minutes. Getting no response to this message, CW-1 (and the agents including me) terminated the plan to meet with WALTER that day. The following day, WALTER, using WALTER's second wireless telephone, left a voicemail message on CW-1's cellular telephone at approximately 11:04 a.m. asking it to call him.

138.    CW-1 did not get back to WALTER until Monday, June 9, 2003. At approximately 1:05 p.m., CW-1 called WALTER on Target Telephone 1. CW-1 reminded him that it had been away for the weekend and that was why it hadn't gotten back to him last week. During this conversation when CW-1 asked WALTER about WALTER's second wireless telephone, one of his telephones, he said that he had to get "a new one" (meaning he had to purchase additional minutes for WALTER's second wireless telephone, a pre-paid cellular telephone).[6] CW-1 explained that it was going to see its cousin in Oregon the next week, but probably would have to wrap up a little more before it left for Oregon (meaning it would get more drug proceeds to WALTER before leaving for its Oregon trip). CW-1 and WALTER agreed to meet on Thursday (June 12, 2003) at 10 a.m.

139.    On June 11, 2003, CW-1 made two calls to WALTER on Target Telephone 1. The

---

[6]Since WALTER made this statement on June 9th, there continues to be activity on WALTER's second wireless telephone. However, those incoming telephone calls are not connecting which indicates that WALTER needs to add minutes to this pre-paid telephone.

(42)

first call went to voicemail and CW-1 did not leave a message. With the second call, at approximately 7 p.m., CW-1 reached WALTER and they agreed to meet the next day at 10 a.m.

140.    On the morning of June 12, 2003, I, along with other DEA agents, set up surveillance in the area of 30 Gardner Street, Brookline. At approximately 9:50 a.m., another agent observed WALTER leave 30 Gardner Street in WALTER'S BMW. After WALTER made a stop at a CVS drug store at the intersection of Cypress Street and Washington Street, surveillance followed WALTER'S BMW to the Barnes & Noble bookstore on Route 9 in Chestnut Hill.

141.    At 9:15 a.m., my co-case agent, another DEA agent and a Natick Police detective met with CW-1 in Brookline. My co-case agent searched CW-1's vehicle; the other DEA agent searched CW-1 and its belongings. These searches were negative for excessive cash, contraband or weapons. My co-case agent gave $3500 to CW-1. CW-1 was also equipped with a transmitting device and micro-recorder on its person.

142.    At approximately 9:50 a.m., CW-1 called WALTER on Target Telephone 1. WALTER did not answer, but CW-1 left a voicemail message that it was on Route 9 and would be there (to meet WALTER) in ten minutes.

143.    The surveillance agents then followed CW-1's vehicle as it drove to the Barnes & Noble bookstore. There, they observed CW-1 enter the store and wait in the Starbucks Café located inside. WALTER arrived at approximately 10:03 a.m. Shortly after WALTER's arrival, at approximately 10:09 a.m., one of the DEA agents entered the bookstore and observed CW-1 and WALTER talking at a table in the Café. The following summary is based on the observations of the surveillance agents including those who were contemporaneously monitoring the conversation via the transmitter receiver, a debriefing with CW-1 immediately after the meeting and my review of the

( 43 )