audiotape of its conversation with WALTER.

144. WALTER gave CW-1 a single Marlboro Lights hard pack. (The contents were later examined and field-tested and determined to contain a sample of a new kind of commercial grade marijuana). WALTER also indicated in this meeting that he had hydroponic marijuana available. The price for this type of marijuana was "36 to 38" ($3600 to $3800 per pound) and could be sold for "42" ($4200 per pound). (Based upon my training and experience, hydroponic marijuana is a type of marijuana that is grown indoors using hydroponic soil and artificial ultraviolet lighting. This type of marijuana has a dramatically higher tetrahydrocannabinol ("THC") level than marijuana grown outdoors and is more desirable among users. It also is more profitable for traffickers to sell this type of marijuana). WALTER further said that the hydroponic marijuana could only be sold in twenty-five pound quantities and he wondered if CW-1 had customers who would want that much. CW-1 said that it would need to get a commitment from a buyer first and that the buyer would want to see every unit first. WALTER said he could give CW-1 a half or a "Z" (ounce) so its buyers could see it in bulk form. CW-1 slid the envelope with the $3500 under a book on the table and WALTER took it without counting the money. CW-1 told him that it was "three and half pages" ($3500). WALTER asked if it would be able to "give something on the tab" (meaning additional money toward its debt owed to WALTER from previous amounts of marijuana that WALTER provided to CW-1 on consignment). CW-1 indicated that it would.

145. During this conversation, CW-1 mentioned its upcoming trip to Oregon to visit its cousin. CW-1 said it wasn't sure if the cousin "was working" (i.e., dealing in marijuana). WALTER reacted strongly and told CW-1 if it did anything with its cousin (in terms of marijuana), then he would not deal with CW-1 any longer. He further explained that given the recent law enforcement

(44)

seizure in the cousin's operation, he was concerned the cousin and his associates might already be cooperating with the DEA.

146. In this conversation, the two talked about several topics that they had discussed in the earlier meetings. WALTER again talked about a large money seizure (believed to be the January 24, 2003 seizure of cash from NEWELL) and said that he and his associates have no further contact with the driver, who was from Oregon, and would not pursue trying to get the money back. He also talked about his ongoing efforts to get enough money for his restaurant business. He also talked about getting his money from Ash-Fouad. WALTER advised that his guys had driven by his house, but hadn't seen Ash-Fouad's car. He said that this guy would follow up in a few weeks. WALTER also asked again about borrowing the metal storage box and said that he would get a pickup truck to pick it up.[7] Given its upcoming trip to Oregon the following week on Wednesday (June 18, 2003), CW-1 would try to get WALTER more money on Monday (June 16, 2003) or Tuesday (June 17, 2003).

147. Shortly thereafter, CW-1 left the Barnes & Noble. The surveillance agents then observed WALTER leave Barnes & Noble at approximately 10:28 a.m. in WALTER'S BMW. Surveillance agents followed WALTER'S BMW back to Brookline and a short time later, surveillance saw WALTER'S BMW parked in the garage at 30 Gardner Street.

148. While this surveillance was ongoing, my co-case agent and other agents met up with CW-1. CW-1 gave the agents the Marlboro Lights pack that WALTER had given it. One agent

---

[7] CW-1 had previously showed me the metal box that it discussed with WALTER. The box is a Husky brand, heavy duty storage container that is approximately five feet in length and three feet in width and three feet in depth. Based upon my training and experience, I believe that the box is capable of storing a large quantity of marijuana.

(45)

searched its person and belongings; another searched its vehicle. The results of these searches were negative for excessive cash, contraband or weapons.

149. On or about the following Tuesday (June 17, 2003), CW-1 left several voicemail messages for WALTER on Target Telephone 1, but it received no return messages from WALTER. CW-1 left for its trip to Oregon on June 18, 2003.

### June 30, 2003 Telephone Conversation Between CW-1 and WALTER

150. WALTER, using Target Telephone 1, left CW-1 a voicemail message on June 29, 2003 at 11:08 a.m. CW-1 returned his call the next day, June 30, 2003 at approximately 11:52 a.m. on Target Telephone 1. WALTER said he had to call CW-1 right back which he did at 11:55 a.m. During their ensuing conversation, WALTER told CW-1, among other things, that he was going on a trip and would be leaving on (July 3, 2003) for three weeks. CW-1 asked WALTER if he was traveling to an island (as WALTER had told CW-1 he had done in the past). WALTER responded affirmatively, but did not elaborate on his destination. WALTER and CW-1 agreed to get together when WALTER got back from his trip so that it could pay WALTER additional monies for the marijuana that WALTER had previously given to CW-1. Specifically, CW-1 told WALTER that it would give him "five" ($5000). WALTER told the CW that he had an "A" thing right now. CW-1 asked if it was "hy hy" (meaning hydroponic marijuana). WALTER replied no, that it was just better (meaning a better grade of marijuana) and that it was 75 more per each (meaning per pound; making the per pound price $1400 per pound). WALTER said he was working on these (pounds of marijuana) before leaving on his trip. CW-1 told WALTER that it would pass on these (quantities of marijuana) and would wait until WALTER returned because it wanted to pay its debt to WALTER first.

(46)

151. On July 3, 2003 (the day that WALTER said he was leaving for his trip), July 4, 5, 6 and 7, 2003, CW-1 attempted to contact WALTER via Target Telephone 1. Its calls to Target Telephone 1 went straight to voicemail. CW-1 did not leave any message for WALTER and these calls were not recorded.

152. Since July 3, 2003, pen register activity for Target Telephone 1 shows only incoming, not ongoing calls. Some of these incoming calls have included calls from other Targets: one incoming call from a telephone subscribed to by RINGHAM was made on July 3, 2003; and on July 4, 2003, a telephone subscribed to by GRAHAM called Target Telephone 1. The incoming calls since July 3rd have also included three calls from two telephones subscribed to in Devonshire, Bermuda. Based upon this information (and the information that WALTER gave CW-1 about his planned trip), I believe that WALTER is in Bermuda, does not have Target Telephone 1 with him, but is checking his voicemail messages on Target Telephone 1.

### WALTER to Return from Bermuda on July 21, 2003

153. On or about July 11, 2003, DEA received information from U.S. Airways that WALTER (and his son, Maxwell Walter) flew to Bermuda from Boston's Logan Airport on July 3, 2003 and were scheduled to return to Logan Airport from Bermuda on Thursday, July 17, 2003. On July 17, 2003, DEA received information from U.S. Airways that on the previous day (July 16th), WALTER had altered their return date so that WALTER and his son are now scheduled to return from Bermuda on Monday, July 21, 2003.

### 5. Information from CW-2

154. CW-2 has provided information to DEA about numerous Targets and their involvement in marijuana trafficking. CW-2 was a member of a conspiracy that distributed large

(47)

quantities of marijuana and cocaine throughout the United States. CW-2 has previously been convicted in 1991 of possession or purchase for sale of narcotics in Santa Barbara and in 1995 for a misdemeanor offense of petty theft. CW-2 agreed to cooperate after it was intercepted engaging in numerous drug-related conversations with MORENO-FERNANDEZ in connection with a DEA San Diego, California wiretap investigation and after a small quantity of illegal drugs was found in its possession. It has not been charged in connection with that seizure.

155. CW-2 first met BANNERMAN toward the end of 1998 in Boston, Massachusetts. In the summer of 2000, CW-2 and an associate named Ferin Martin, a/k/a "Mustard," drove to Tucson, Arizona to purchase 800 pounds of marijuana for BANNERMAN. They bought 150 pounds of marijuana from a source and drove it to San Diego. BANNERMAN rejected the marijuana because of its poor quality. However, BANNERMAN advised CW-2 that he had a friend who purchased poor quality marijuana and arranged for the friend, subsequently identified as ▆▆▆ to fly to California to inspect the marijuana. ▆▆▆ met with CW-2 and Martin.

156. According to CW-2, starting in October 2001 ending in or about March 2002, BANNERMAN purchased the first of several loads of marijuana from MORENO-FERNANDEZ. CW-2 brokered all of these loads, in conjunction with MORENO-FERNANDEZ. According to CW-2, BANNERMAN never met directly with the Alvarez brothers, the suppliers of these loads, or MORENO-FERNANDEZ in connection with these loads. The first load, 850 pounds, was sold to BANNERMAN and MILO. BANNERMAN paid $300,000 in cash as a partial payment for the load, with the remaining $200,000 due several days later. CW-2 delivered the money to MORENO-FERNANDEZ and his associate Pedro Alvarez. Eleven days later, BANNERMAN sent the remaining $200,000 via a courier who traveled by bus. After this deal, BANNERMAN said he

(48)

would not buy more than 500 pounds at a time. The second load purchased by BANNERMAN was 495 pounds. The third load was 1200 pounds and part of the payment was delivered by MILO. The fourth load was 495 pounds and BANNERMAN purchased this load. The fifth load was 500 pounds purchased by MILO. The sixth load was 495 pounds, purchased by BANNERMAN and Jim LNU.

157.  In the summer and fall of 2002, CW-2 engaged in a number of consensually recorded telephone calls with MORENO-FERNANDEZ regarding the purchase of marijuana. CW-2 also engaged in several meetings with MORENO-FERNANDEZ which were surveilled.

158.  On October 23, 2002, MORENO-FERNANDEZ advised CW-2 that he had 3500 pounds of marijuana in his possession for distribution to four different customers. On this date, CW-2 attempted to acquire 1000 pounds of marijuana from MORENO-FERNANDEZ. During this meeting, MORENO-FERNANDEZ told CW-2 that aside from the 1000 pounds that CW-2 ordered, MORENO-FERNANDEZ had amounts of 1500, 500 and 800 pounds of marijuana for other customers. This is significant in that MORENO-FERNANDEZ contacted BANNERMAN's former voicemail box, 617-499-1990, numerous times from mid-October thru November 2002 including on October 23, 2002. It is also significant that hotel records show that NEWELL, who I believe was a drug and drug proceeds courier for BANNERMAN, was staying at the Holiday Inn Express in Cambridge on October 23 and 24, 2002. Accordingly, I believe MORENO-FERNANDEZ was calling BANNERMAN in connection with a load of marijuana destined for Massachusetts.

159.  On the day when CW-2 was going to visit the stash location and obtain the 1000 pounds, MORENO-FERNANDEZ advised CW-2 that he could not supply CW-2 with his share that day. CW-2 has subsequently spoken with MORENO-FERNANDEZ by telephone on several occasions but has been unable to negotiate another deal with him. Indeed, an associate of

(49)

MORENO-FERNANDEZ has advised CW-2 that MORENO-FERNANDEZ believed that CW-2 might be arrested, or may have already been arrested and to be careful dealing with him.

160. CW-2 also agreed to place a consensually recorded telephone call to Farren Martin, in October, 2002, during which Martin confirmed previously meeting ▇▇▇ nd that ▇▇▇ dealt with poor quality marijuana. CW-2 asked Martin for ▇▇▇'s telephone number, but Martin never got back to it with the number. Martin was subsequently arrested in connection with an ecstacy investigation and is not cooperating.

161. In or about October 2002, CW-2 placed a consensually recorded telephone call to MORENO-FERNANDEZ who stated, in substance, that he had not been in contact with BANNERMAN recently, and that BANNERMAN did not have his number. MORENO-FERNANDEZ's claim that he had not been in contact with BANNERMAN is contradicted by telephone toll analysis which shows twenty-nine calls from a telephone used by MORENO-FERNANDEZ, telephone number (619) 227-8378, subscribed to in the name of Iliana Fimbres, 3590 Market Street, San Diego, into BANNERMAN's former voicemail box between July 10, 2002 and January 8, 2003. I believe this indicates that MORENO-FERNANDEZ lied to CW-2 either because he suspected it is cooperating or because he was attempting to cut CW-2 out as the middleman and deal directly with BANNERMAN.

162. On or about October 17, 2002, February 4, 2003 and February 25, 2003, CW-2 left consensually monitored messages for BANNERMAN on BANNERMAN's former voicemail box. To my knowledge (and based upon review of toll records and pen register data), BANNERMAN never returned any of these calls.

(50)

### 6. Information from CW-3

163. CW-3 is currently incarcerated on federal drug trafficking and firearm charges in federal district court in Boston. These charges arise out of transaction in which CW-3 purchased ten kilograms of cocaine from an undercover officer. CW-3 is currently cooperating with DEA. A Massachusetts criminal record check reveals that CW-3 has been charged numerous times between 1987 and 2000. These charges including but not are limited to threatening murder, and assault and battery with a dangerous weapon.

164. In the summer and fall of 2001, the Massachusetts State Police ("MSP") conducted an investigation of marijuana trafficking in the Brockton, Massachusetts area. CW-3 was a target of the investigation. On or about August 1, 2001, the MSP initiated a state wiretap on several of CW-3's telephones. During the course of this wiretap, CW-3, ▓▓▓▓ and others were intercepted.

165. On or about August 31, 2001 and shortly thereafter, CW-3 detected law enforcement surveillance and its subsequent intercepted phone calls indicated an awareness of being recorded and its phone activity slowed down considerably. The MSP wiretap was turned off on the afternoon of September 11, 2001 as a result of these developments and the terrorist attacks. No one, including CW-3, was charged as a result of the MSP investigation.

166. CW-3 identified ▓▓▓▓ as one of his marijuana customers and an alternative source of supply. ▓▓▓▓ took approximately 100 pounds of a 1600 pound load of marijuana that CW-3 brought back from Houston to Massachusetts in the fall in the late 1990s. CW-3 further reported that after the Houston load, ▓▓▓▓ and it traveled to Tucson. There, they viewed a load of approximately 700 to 800 pounds of marijuana presented to them by sources of supply from California. After ▓▓▓▓ saw the load, he flew back to Massachusetts. CW-3 drove the load back

(51)

to Massachusetts. According to CW-3, ▇▇▇ took hundreds of pounds of marijuana from this load. Following this load, there were several more loads of marijuana from Tucson that CW-3 and ▇▇▇ transported and/or received. From each of these loads of marijuana, ▇▇▇ took a substantial portion. Following the loads from Arizona, CW-3 received two loads of marijuana delivered by tractor-trailer truck to Massachusetts from California sources. Both of these loads were delivered to the EZ Mini-Storage facility in Natick (where ▇▇▇ currently rents storage space). From the first of these loads, in or about the fall 2001, CW-3 took the entire 700 pounds of marijuana and distributed some quantity of this load to ▇▇▇. In the first week of December 2001, a second load of approximately 1500 pounds was delivered to the same location, the E-Z Mini-Storage facility. This delivery was seized by DEA, but no arrests were made at the time. Although CW-3 reported that it had no prior agreement with ▇▇▇ to take part of this load, based upon past practice, it expected that ▇▇▇ would have taken a significant portion of this marijuana if DEA had not seized it.

### 7. Information from CW-4

167.   CW-4 is currently charged in federal district court with participation in a marijuana distribution conspiracy. CW-4's criminal record includes charges between 1985 and 1990 for assault with a dangerous weapon, malicious destruction of property, larceny, gaming and assault and battery. CW-4 is currently cooperating with DEA. From in or about the fall of 2001, CW-4 delivered approximately six to ten loads of marijuana from MILO to a customer in Massachusetts. The loads ranged from forty to 200 or more pound loads of marijuana. At some point prior to September 2002, MILO told CW-4 that he was getting out of the (marijuana) business and introduced him to another individual as a source of supply. Although CW-4 and MILO have had some social contact since

(52)

then, they have not had any marijuana dealings since then.

## V. TOLL ANALYSIS OF THE TARGET TELEPHONE 1, (617) 901-0104

168. Since January 2002, law enforcement agents have obtained and analyzed telephone toll records, pen register and trap and trace information for wireless telephones, voice mailboxes and pagers utilized by WALTER, BANNERMAN, ████ MILO, ████ and others. On March 14, 2003, pursuant to a court order, DEA installed a trap and trace device on Target Telephone 1. The following analysis is based upon pen register data and telephone toll records of telephone numbers in contact with Target Telephone 1 that are associated with other WALTER telephones or telephones associated with other Targets.

### A. Contact Between Other Telephones Associated with WALTER and the Target Telephone

169. (617) 277-4117 is subscribed to by Kurt WALTER, 30 Gardner Road, Brookline, Massachusetts. Between March 20, 2003 and June 21, 2003, there were 107 incoming calls from this number to Target Telephone 1. In addition, between March 15, 2003 and June 22, 2003, there were fifty-five (55) outgoing calls from Target Telephone 1 to (617) 277-4117. (617) 269-7624 is also subscribed to by Kurt WALTER, 140 K Street, South Boston, Massachusetts. Between March 21, 2003 and April 11, 2003, there were four (4) outgoing calls from Target Telephone 1 to (617) 269-7624.[8]

---

[8] As discussed elsewhere in this Affidavit, this investigation has not revealed where WALTER is residing, although there are several addresses associated with him. The investigation has also revealed that WALTER has (or had) a girlfriend, although it has not revealed if WALTER and this girlfriend were or are living together or if WALTER has any other roommates. Accordingly, we believe, but are unable to confirm that these calls to/from this telephone to Target Telephone 1 are either WALTER checking voicemail on Target Telephone 1 or someone associated with him calling him (or WALTER calling them) on Target Telephone 1.

(53)

170. WALTER's second wireless telephone also has had contact with Target Telephone 1. On April 9, 2003, there was one incoming call from WALTER's second wireless telephone to Target Telephone 1. Between March 17, 2003 and May 13, 2003, there were twenty-three (23) outgoing calls from Target Telephone 1 to WALTER's second wireless telephone.[9]

### B. Contact Between Telephones Associated with Other Targets and the Target Telephone

171. According to Sprint, telephone number (617) 970-8308 is subscribed to by Karen Woo, 60 Lawton Street, Brookline, Massachusetts. Analysis of pen register data[10] for this telephone number from April 18, 2003 through June 25, 2003 indicate that this phone is used by BANNERMAN. In addition, BANNERMAN provided this telephone number as his business contact number to Continental Airlines sometime after he opened his frequent flier account on January 8, 1998. Between March 17, 2003 and June 22, 2003, there were ninety-five (95) incoming calls from this telephone number to Target Telephone 1. From March 20, 2003 through June 22, 2003, there were thirty-six (36) outgoing calls from Target Telephone 1 to this telephone number. There were two other telephone numbers associated with Karen Woo at 60 Lawton Street, Brookline, Massachusetts -- (617) 277-8598 and (617) 767-3334 -- that have also had contact with Target Telephone 1 between March 17, 2003 and June 21, 2003.

172. (617) 780-8615, a prepaid telephone subscribed to by Dawn Remmington, 120 Newbury Street, Boston, Massachusetts, also believed to be used by BANNERMAN (based on pen

---

[9] Since WALTER is the user of both Target Telephone 1 and WALTER's second wireless telephone, it is possible that the calls between the two are WALTER checking the voicemail of the other.

[10] This pen register analysis revealed, among other things, that this telephone has been in contact with the telephones of at least two BANNERMAN family members, one of his former roommates and some of his known associates.

(54)

register data analysis) contacted Target Telephone 1 one time on December 10, 2002.

173. The Target Telephone 1 has previously contacted a wireless telephone used by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ten (10) times between November 9, 2002 and November 12, 2002.

174. Telephones associated with Target GRAHAM have also had contact with Target Telephone 1. Sprint identified John S. GRAHAM, 282 Montville Avenue, Woburn, Massachusetts as the subscriber for (617) 290-2240. There were fifty-seven (57) incoming calls from this telephone number to Target Telephone 1 between March 15, 2003 and June 20, 2003. There were nine (9) outgoing calls from Target Telephone 1 to this telephone number between March 27, 2003 and June 19, 2003. Phones associated with GRAHAM's business also had contact with Target Telephone 1. InfoUSA business records indicate that GRAHAM-KIM DESIGN LTD. is owned by John GRAHAM. (781) 935-3453 is subscribed to by this company, GRAHAM-KIM DESIGN LTD., 282 Montvale Avenue, Woburn, MA. There were five (5) incoming calls from this telephone number to Target Telephone 1 between March 27, 2003 and June 12, 2003. Another telephone, (781) 935-3454, is also subscribed to by this company, GRAHAM-KIM DESIGN LTD., 282 Montvale Avenue, Woburn, Massachusetts. Between March 18, 2003 and June 20, 2003, there were seventeen (17) incoming calls from this telephone number to Target Telephone 1.

175. Telephones associated with Target ▓▓▓▓▓▓▓ have also called into or have been called by Target Telephone 1. Nextel identified the subscriber to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ s. There were thirty-seven (37) incoming calls from this number to Target Telephone 1 between April 3, 2003 and June 22, 2003. Between March 27, 2003 and June 7, 2003, there were nine (9) outgoing calls from Target Telephone 1 to this

(55)

telephone number. Another telephone number associated with ████████████████████████████████████████████████████████ On May 16, 2003, there was one (1) incoming call from this telephone number to Target Telephone 1.

176. A telephone, (508) 498-6041 subscribed to by James J. BALDINI, 13 Briar Drive, Milford, Massachusetts, received two (2) outgoing calls from Target Telephone 1 between March 15, 2003 and April 18, 2003.

### C. Toll Analysis of Target Telephone 1 on April 21, 2003, the Day of WALTER's Marathon Party

177. As previously discussed, on April 21, 2003, my co-case agent and I observed WALTER using a wireless telephone during the course of WALTER's Marathon party. An analysis of the pen register data and cell site information for Target Telephone 1, 617-901-0104, revealed that the telephone that WALTER was using during the Marathon Party was Target Telephone 1.

178. The cell site information was provided by AT&T Wireless, the carrier for Target Telephone 1. There were three (3) cell sites that Target Telephone 1 hit during the time frame that we conducted surveillance on the Marathon party, between 10:30 a.m. and 2:30 p.m. The three (3) cell sites are 645 Beacon Street (the Buckminster Hotel) in Kenmore Square, Boston; 380 Longwood Avenue which is between 179 Longwood (the MA College of Pharmacy) and 300 Longwood (Children's Hospital); and 2000 Commonwealth Ave (the 2000 Commonwealth Avenue Apartment Building), Brighton. As discovered after consulting a map of the area, these three (3) cell sites form a triangular pattern. The physical location of the Marathon party where WALTER was using a wireless telephone fell near the center of this triangular pattern.

(56)

179. During the Marathon Party, between 10:30 a.m. and 2:30 p.m. when we were conducting surveillance, there were a number of calls made from or received by Target Telephone 1. These calls included but were not limited to calls to the telephones of individuals who were later observed at the Marathon Party: three (3) outgoing calls from Target Telephone 1 to telephones associated with John McCarthy and one (1) incoming call from one of McCarthy's telephones to Target Telephone 1; two (2) outgoing calls from Target Telephone 1 to (617) 884-4931, subscribed to by Anastacia Wilson, 110 Bellingham Street, Chelsea, Massachusetts; ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and an outgoing call to (617) 320-6286 subscribed to by Adam Samuelian ("Adam" whom CI-2 encountered during the party who was later identified as Adam Samuelian), 727 Washington Street, Franklin, Massachusetts.

180. Target Telephone 1 also received an incoming telephone call during the Marathon party from (305) 852-9959 subscribed to by Laurie Hall, Esq., 171 Hood Avenue, Key Largo, Florida. On or about January 16, 2003, WALTER was arrested by the Monroe County Sheriff's Department, Monroe County, Florida for driving under the influence of alcohol or drugs. On May 8, 2003, the arresting officer in that matter, Deputy Sheriff Sheila Seago, informed me that Laurie Hall of the same address as listed as the subscriber information for the telephone number above was WALTER's attorney on the case. During the Marathon party, Target Telephone 1 also received an incoming call from (617) 970-8308 subscribed to by Karen Woo, 60 Lawton Street, Brookline, Massachusetts. As previously discussed, the user of this phone is believed to be BANNERMAN.

## VI.  THE NEED FOR INTERCEPTION

### Goals Of The Investigation

181. This ongoing investigation has targeted a high-level, sophisticated drug trafficking

(57)

operation. The principle goals of this phase of the investigation include obtaining admissible evidence of:

(1) the nature, extent, and methods of the drug importation, drug transportation, drug distribution, and money laundering business of the Targets and others;

(2) the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in the illegal activities of the Targets, including, but not limited to, drug suppliers, couriers, drug distributors, drug customers of the Targets, collectors of drug proceeds, and transporters of drug proceeds;

(3) evidence regarding the importation, transportation and distribution of drugs, money, and other proceeds involved in the above illegal activities;

(4) the existence and location of records related to the above illegal activities;

(5) the location and source of resources used to finance the above illegal activities;

(6) the location and disposition of proceeds from the above illegal activities;

(7) the locations and items used in furtherance of the above illegal activities, including, but not limited to, the locations where drugs are imported, transported, and stored prior to distribution; and

(8) the times, dates, and locations when and where the persons involved in the above illegal activity import narcotics, distribute narcotics and meet to discuss their narcotics trafficking activities.

182. To date, this investigation has revealed that WALTER is distributing marijuana, but not the identities of all source(s) of supply, the number and location of his stash location(s) or his current customers, other than CW-1. In regard to the other Targets, most specifically ▓▓▓, BANNERMAN and ▓▓▓ the investigation has revealed historical information about their drug trafficking, their historical relationships with some of the other Targets, but has not revealed their current drug trafficking activities. Moreover, the investigation has not revealed the nature of the current relationships between the Targets in terms of their respective roles in the drug trafficking

(58)

conspiracy.

183. The investigatory techniques utilized to date have produced valuable, but limited, results. Based upon my training and experience, as well as the experience of the other DEA Special Agents and local law enforcement officers involved in this investigation, and based upon all the facts set forth herein, it is my belief that the interception of wire communications is the only available technique that has a reasonable likelihood of securing the evidence necessary to satisfy the goals of the investigation. Additionally, the interception of wire communications is the only available technique that has a reasonable likelihood of securing evidence necessary to identify the full nature and scope of the drug trafficking and money laundering activities of the Targets and their associates.

184. To advance the aforementioned goals of this investigation, interception of wire communications on Target Telephone 1 is necessary.

## VII. THE USE AND EXHAUSTION OF NORMAL INVESTIGATIVE TECHNIQUES

185. The following investigative procedures that are usually employed in the investigation of a criminal case like this one have been tried and failed, or appear to be unlikely to succeed if tried, or are too dangerous to employ.

### A. COOPERATING WITNESSES AND CONFIDENTIAL INFORMANTS

#### 1. Use of CW-1

186. As discussed in detail above, CW-1, a customer and previous supplier of WALTER, has been able to make several consensually monitored calls and controlled deliveries of drug proceeds to and one purchase of marijuana from WALTER in the past month or so. It was also able to confirm WALTER's awareness of the January 24, 2003 money seizure from NEWELL. There are, however, limits to the information and assistance that CW-1 can provide. First, CW-1 does not

(59)

know WALTER's true name; it only knows WALTER as "CORT." CW-1 also does not know where WALTER lives. Although it had been a past supplier of marijuana to WALTER, it is not aware of WALTER's current supplier(s) or any other drug supplier(s) that he has had in the past. It has no information about WALTER's other current customers. (Although CW-1 has provided information about WRIGHT, a former customer of WALTER's who owed WALTER money for marijuana, it does not know if WRIGHT is a current customer of WALTER's). Moreover, given that WALTER was not even willing to tell CW-1 the true identity of the person he was using to collect drug proceeds from CW-1's own customer, Ash-Fouad, it is unlikely that he will share information with CW-1 about his sources of supply, other current customers or other aspects of his drug operation. He has not done so to date.

2. **Use of CW-2**

187.   CW-2 has provided information about some of the Targets, namely BANNERMAN, (and to a lesser degree, MILO and ▅▅▅▅ CW-2, however, was involved primarily in brokering deals and has no direct evidence regarding who BANNERMAN is currently receiving his drugs from, who he is selling them to, how the drugs are being transported, where they are stored in Massachusetts, who BANNERMAN is selling the drugs to and what he is doing with the drug proceeds. Moreover, CW-2 had no involvement in the distribution of the drugs after they arrived in Massachusetts. In addition, CW-2's attempts to make consensually monitored calls to advance the goals of this investigation have met with little success. Although CW-2 made consensually monitored calls in the summer and fall 2002 to MORENO-FERNANDEZ and later to Fein Martin, such contact is no longer possible. As previously discussed, MORENO-FERNANDEZ has cut off contact with CW-1 and Martin was subsequently arrested and is not cooperating. Moreover, CW-2's

consensual monitored calls to BANNER MAN's former voicemail box in October 2002 and February 2003 have not been returned. It appears that the Targets that have dealt with CW-2 in the past are either cutting it out of their operation and/or are aware that CW-2 is cooperating with law enforcement. Either way, CW-2's ability to provide additional assistance to further this investigation as well as its ability to introduce any undercover agents or third parties to the Targets is limited.

188.  I should note that CW-2 had contact with BANNERMAN's former voicemail box on April 12, 2003 that was not specifically directed by DEA. Given the possibility that CW-2's April 12, 2003 contact with BANNERMAN's voicemail box was an attempt to warn or advise BANNERMAN of the ongoing investigation of his criminal activities, (CW-2 had previously informed me that, during prior cooperation with law enforcement officers in California in an unrelated matter, it had alerted a target of the investigation that the officers were investigating him), I applied to this Court for a search warrant for stored electronic information, including opened and unopened voicemail, on BANNERMAN's former voicemail box. On April 17, 2003, a search warrant was granted by this Court and executed on the 1990 Box. One (1) of the two messages seized was from CW-2. In the message, CW-2 said that it had heard that there was a rumor out there that it (CW-2) had "a problem." CW-2 further stated that if BANNERMAN knew anything about this, CW-2 would like to meet BANNERMAN in person to discuss it. Based upon the investigation and my training and experience, I believe that CW-2's reference to a rumor about "a problem" is a reference to the rumor circulating that it was cooperating with law enforcement. I further believed that the purpose of CW-2's message was either to do damage control with BANNERMAN (i.e., attempt to dispel the rumor that it was cooperating) or to confirm the rumor and warn BANNERMAN that it was cooperating. We have no information that CW-2 has attempted to

(61)

contact BANNERMAN since April 12, 2003. For strategic reasons, DEA has neither advised CW-2 of the fact that it obtained a search warrant to listen to its message nor asked it about any attempts to contact BANNERMAN on its own.

### 3. Use of CW-3

189. CW-3 has provided information only about one Target, ▬▬ CW-3 is currently incarcerated on pending federal drug and firearm charges. Accordingly, the assistance that CW-3 can currently provide is in the form of historical information as opposed to proactive assistance. His ability to provide any proactive assistance in this matter is further impeded by the fact that the one Target about whom CW-3 has provided information, ▬▬ is aware that CW-3 is incarcerated. A few weeks after CW-3's arrest on January 31, 2003, ▬▬ visited CW-3's residence. There, ▬▬ spoke to CW-3's sister who informed him of CW-3's arrest and incarceration. ▬▬ knowledge of CW-3's arrest and incarceration indicates that CW-3 would have no success in attempting to make consensual calls or controlled meets with ▬▬ and, most likely, with other Targets who are participants in the same drug trafficking operation.

### 4. Use of CW-4

190. CW-4 has only provided information about one of the Targets, MILO. However, even this information is limited in the sense that it is historical information since CW-4 stopped having marijuana dealings with MILO before in or about September 2002. CW-4 is currently charged in federal district court in Boston with drug trafficking. DEA is aware that CW-4 called its source of marijuana (to whom CW-4 was introduced by MILO) when it was stopped by the police, but before CW-4 was arrested. DEA is contemplating having CW-4 make consensually monitored contact with MILO, but it is unclear that this contact will be successful since there is the possibility

(62)

that MILO is already aware of CW-4's arrest. Even if this contact was successful, it would not fulfill all of the goals of this investigation. For instance, even when MILO was supplying CW-4 with marijuana, CW-4 was not aware of MILO's source(s) of supply or MILO's other customers.

5. **Use of CI-1**

191. CI-1 is a confidential informant and is not willing to testify. Moreover, CI-1 currently only has contact with one of the Targets. However, even its contact with this Target is limited: this contact does not concern drug trafficking nor is this contact conducive to CI-1 raising the subject of drug trafficking or attempting to introduce an undercover agent or third party to this Target for the purpose of consensually monitored calls or controlled deliveries.

6. **Use of CI-2**

192. CI-2 had no knowledge of WALTER or any of the Targets prior to WALTER's Marathon party on April 21, 2003. Immediately prior to that meeting, my co-case agent and I told CI-2 that a certain person (WALTER whom we did not identify by name) organized a party along the route of the Boston Marathon, showed it photographs of WALTER and ■■■■, explained that these individuals are drug traffickers and instructed CI-2 to attempt a chance meeting with them at the party with the purpose of gleaning any illicit drug-related information and to cultivate a future drug trafficking relationship with them. Even having providing these instructions and information, however, CI-2 was used only as a pair of eyes and ears to observe WALTER and his associates. Although at various points during the day, CI-2 overheard snippets of WALTER talking on his wireless telephone and snippets of an in-person conversation that WALTER had with one of his guests (whom CI-2 learned was named "John")[11], which, based upon my training and experience,

---

[11] Issues about CI-2's credibility have arisen in the past. Specifically, CI-2, a paid DEA
(continued...)

(63)