were consistent with discussions about drug transactions. CI-2 was unable even to get WALTER's telephone number before it left the Marathon party. When CI-2 requested it, WALTER explained to it that it did not distribute this information. This response illustrates the difficulty that any one cooperating witness, confidential informant, undercover agent or third party who is not already involved in the Targets' drug trafficking operation would encounter if any attempts were made to infiltrate the operation.

## 7.     Use of other confidential sources

193.     Along with CW-3, there was another defendant charged by a federal grand jury sitting in Boston with cocaine trafficking-related charges. This second defendant, when initially arrested, made a written and oral statement, that among other things, implicated itself and CW-3 in a marijuana trafficking conspiracy. Although DEA and the U.S. Attorney's Office have made overtures to this defendant to cooperate, the co-defendant of CW-3 is not currently cooperating.

194.     More than one of the defendants indicted as a result of the San Diego wiretap investigation have offered to cooperate and have provided information regarding their drug trafficking with MORENO-FERNANDEZ. However, none of these individuals dealt directly with any of MORENO-FERNANDEZ's customers in Massachusetts; moreover, none of them know of MORENO-FERNANDEZ's current whereabouts. In addition, while the San Diego DEA office may

---

: (...continued)
informant who has a criminal record in three states and who initially began cooperating after he was the target of a DEA investigation, had issues about its past credibility arise in the course of CI-2's testimony in federal court in Boston within the past year. I do not, however rely upon CI-2's information for probable cause, but for completeness of the account of surveillance of the Marathon party and as an example of DEA's exhaustion of alternative investigative means. Moreover, I believe that the limited information that CI-2 provided in regard to the party is reliable because of its lack of prior knowledge of WALTER and because, in large measure, CI-2's observations were corroborated by my (and my co-case agent's) observations on surveillance of the Marathon party and information from other sources.

(64)

have developed sufficient evidence to indict MORENO-FERNANDEZ, based on the intercepted wiretap conversations combined with the potential testimony of several cooperating witnesses, they do not possess any direct evidence regarding the other Targets of this investigation.

195.    In April 2002, two individuals were charged (by way of criminal complaint filed in federal district court in Boston under seal) with participation in the delivery of approximately 1500 pounds of marijuana during the first week of December 2001 to EZ Mini-Storage in Natick, Massachusetts. The two individuals were the driver and passenger of the trailer truck that drove the marijuana load into Massachusetts and delivered it to the storage facility. The two individuals are currently in state custody in Queens County, New York awaiting trial on other drug charges and the criminal complaint against them in this District is still pending. In the fall 2002, my co-case agent debriefed both individuals. Neither of these two individuals interacted with any of the Targets. Moreover, they have been incarcerated, out-of-state, since April 2002 and, therefore, their ability to provide any type of proactive assistance is very limited.

196.    A confidential informant working with the New York City Police Department ("NYPD") has provided information about an individual whom I believe is ████████This informant described an individual who fits ███████description as one of three Boston-based marijuana customers of Jose Salas, a drug trafficker based in California who oversaw distributions to Massachusetts. This informant arranged for the transport of loads of marijuana to Massachusetts. This informant began cooperating with the NYPD after he was involved in the shipment of a large quantity of cocaine to Queens, New York which the NYPD seized. To my knowledge, this informant has not yet been charged in connection with that seizure and currently is not incarcerated. The assistance that this informant can provide at this point against the Targets is limited because it

(65)

cannot identify even ▆▆▆▆ by name and it is under the control and supervision of NYPD, an agency that is not actively participating in this investigation.

197.  I am unaware of any other informants or cooperating witnesses who have information regarding any other Targets of this investigation.

## B.  ATTEMPTED INFILTRATION BY UNDERCOVER AGENTS

198.  Aside from CW-1, DEA does not know of any individual who could even attempt to introduce an undercover agent to WALTER.

199.  It is unlikely that an undercover agent would be permitted to infiltrate sufficiently the organization to achieve the goals of the investigation. Given the measures taken by members of this conspiracy to avoid detection by law enforcement, it is extremely unlikely that the Targets would agree to deal directly with an entirely unknown individual. Developments in this investigation to date bear this out. For example, WALTER declined to even give his telephone number to CI-2 at his Marathon party. Even if they did, if the agent were to pose as a prospective source of supply, it is unlikely that he would obtain any more information than CW-1 has been in a position to obtain, given that DEA would not be able to allow WALTER to take control of the drugs, thus limiting our ability to learn to whom WALTER distributed the drugs.

200.  The Targets' sensitivity to detection by law enforcement has been borne out by a sequence of actions by them in the wake of law enforcement seizures or arrests. Soon after the January 24, 2003 money seizure from NEWELL, use of BANNERMAN's former voicemail box dropped off significantly and eventually was turned off for nonpayment on or about June 23, 2003. Similarly, soon after ▆▆▆▆▆ visited CW-3's sister and learned of CW-3's arrest, the activity on ▆▆▆▆▆ own voicemail box, ▆▆▆▆▆▆▆ also dropped off significantly and subsequently this

(66)

box was also closed due to nonpayment on or about April 2, 2003.

C.   THE GRAND JURY

201.   Based upon my training and experience, the facts of this case and my discussions with Assistant United States Attorneys for the District of Massachusetts who have experience prosecuting violations of criminal law, I believe that subpoenaing persons believed to be involved in this conspiracy and their associates before a federal grand jury would not be completely successful in achieving the stated goals of this investigation. If any of the principals of this conspiracy, their co-conspirators or other participants were called to testify before the grand jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. The United States likely would not seek to immunize these persons because it might foreclose prosecution of the most culpable members of the conspiracy. Moreover, the granting of immunity to targets of the investigation would not ensure that they would testify truthfully before the grand jury.

202.   The service of grand jury subpoenas upon the principals of this conspiracy or their co-conspirators would only alert them to the existence of this investigation. This would cause the Targets to become more cautious in their activities, to flee to avoid further investigation or prosecution, to threaten the lives of confidential informants or cooperating witnesses or otherwise compromise this investigation.

D.   PHYSICAL SURVEILLANCE

203.   DEA has made numerous attempts to conduct surveillance of the Targets, but with very limited success.

204.   There are three addresses associated with WALTER: 25 Royal Road, Brookline,

(67)

Massachusetts; 30 Gardner Road, Brookline, Massachusetts; and 140 K Street, South Boston, Massachusetts. Although CI-1 has informed law enforcement that it knew WALTER's residence to be 25 Royal Road back in the mid-1990s, I have no current information about where WALTER actually resides today.

205.    There has been surveillance of WALTER on numerous occasions in this case: on January 24, 2003 when WALTER met with NEWELL shortly before the money seizure from NEWELL; on April 21, 2003, at the Marathon party that WALTER hosted; and in connection with his controlled meetings with CW-1 on May 22, 2003, May 28, 2003 and June 12, 2003. Some of these surveillances involved surveillance of WALTER at or near the Royal Road and Gardner Street addresses.

206.    There has been no surveillance of WALTER at the K Street address, but there have been two instances in this investigation when the address has been observed. First, during the week of May 6, 2003, my co-case agent made a visual inspection of the K Street address. He observed that there is a triple-decker, three-family residence at this address and that it is located on a residential block. On a second occasion, in connection with surveillance of CW-1's meeting with WALTER on May 22, 2003, a law enforcement agent set up surveillance on the K Street address. During the course of this surveillance, the agent did not observe either WALTER or WALTER'S BMW at this address.

207.    Sustained surveillance at any of these addresses is not practical and may cause WALTER and other Targets to become aware of the investigation. Each address is a private residence or residences and each is located in a residential area. Therefore, the mere presence of undercover vehicles may be detected by the Targets. For example, on May 28, 2003, in connection

(68)

with surveillance of 30 Gardner Street, a surveillance agent observed two men from the 30 Gardner Street apartment building. These men stared up the street toward the agent's vehicle and then got into a white Ford Explorer. The same vehicle with two men had been observed on January 24, 2003 after WALTER was followed by surveillance from his meeting with NEWELL to Brookline. At that time, another surveillance agent had observed that the two male subjects were looking around and departed the area abruptly. This is another example of the surveillance-conscious nature of not even the Targets themselves, but of people who may associated with the Targets.

208.    Our efforts to surveill BANNERMAN have been unsuccessful. To date, we have obtained information regarding two Massachusetts residences that I believe are used by BANNERMAN. BANNERMAN has a Massachusetts driver's license with a listed address of 304 Newbury Street, Apartment 152, Boston, MA. On October 3, 2002, myself and a fellow agent went to 304 Newbury Street and learned that it was the address for Mailboxes, Etc. which did have a mailbox number 152 but with no name visible.    According to the Registry of Deeds, BANNERMAN is the owner of record for a residence and large parcel of land at 23 Pilgrim Byway, Duxbury, MA. Along with fellow agents, I have observed this property from the road and through aerial photographs; it is a secluded property with a large, sturdy stockade fence, approximately eight to ten feet tall, surrounding the vast majority of the perimeter of the property, making surveillance from the road, or any other direction, not practicable. In addition, the road leading up to the property and the roads in the immediate area around the property are isolated. Thus, any stationary surveillance cars would be become immediately obvious to passers by. Agents have visited the property approximately a dozen times. They have been unable to see into the property or see any cars or individuals entering or leaving the property.

209.    According to CW-2, BANNERMAN has an apartment overlooking Copley Square. A public records check revealed that, in fact, BANNERMAN has an apartment at 790 Boylston Street, Apartment 17E. I have surveilled this building; it is a high-rise luxury apartment building, known as the Fairfield, the upper floors of which overlook Copley Square. The building has a 24-hour lobby receptionist and security. There are two parking lots associated with the Fairfield: an open air private parking lot on the street level and a secured parking section located underneath the building.

210.    CW-2 also stated that BANNERMAN has an apartment in the Marina Del Ray section of Los Angeles which CW-2 has visited; although CW-2 knows the location of the apartment, CW-2 does not recall the specific address.

211.    Between November 13, 2002 and February 7, 2003, approximately twenty surveillances were attempted at BANNERMAN's Massachusetts addresses. These surveillances occurred on different days of the week and at different times. During these attempts, neither BANNERMAN nor any vehicles owned by him were observed. Both the Duxbury and the Fairfield residences are situated in such a way as to make static surveillance impracticable. For example, on November 25, 2002, surveillance was attempted on BANNERMAN's Duxbury residence. Although aerial surveillance agents could see two vehicles on the property, they could not observe the vehicles' license plate numbers. The only time that BANNERMAN has been observed was by me on May 2, 2003. While traveling by myself on Route 93 Northbound in the Boston area, I, by chance, observed a vehicle that matched the physical description of a vehicle that BANNERMAN has registered in his name. The vehicle also had a "DUX" insignia on a spare tire cover that was on the rear of the vehicle. I believed "DUX" to be an abbreviation for Duxbury, the town in which

(70)

BANNERMAN has his car registered and where BANNERMAN owns property. Driving alongside the vehicle, I observed an individual who I believed to be BANNERMAN. It was not feasible to follow this vehicle given the surprise nature of my observations and the fact that other surveillance units and agents were not with me.

212.    With respect to ███████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████ is residence several times, performing a series of u-turns at odd times and also driving unusually slow, before he entered his garage. ███████ also stopped at the entrance to his parking garage for approximately two minutes for no apparent reason before entering the garage. I have observed numerous other cars enter and exit this location without stopping for such a noticeable period of time. In my opinion, ███████ was stopping to observe the traffic passing by, for counter-surveillance purposes, before entering his garage.

213.    Agents surveilled the location of ██████████████████████████████ January 22, 2003 during business hours. ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

(71)



April 17 and 18, 2003, agents conducted surveillance of ▮▮▮▮▮▮▮▮▮▮▮▮▮ During these surveillances, agents observed ▮▮▮▮▮▮▮

214.   Previous efforts have been made to identify MILO's current residence, without success.  On July 6, 2003, an updated RMV inquiry was made regarding MILO.  This inquiry revealed a new address for MILO at 9 Woodbury Lane, Rockport, Massachusetts. Due to the recent receipt of this information, a physical check of this location has not yet been performed.

215.   The surveillance of NEWELL on January 24, 2003, the day of the money seizure has been previously discussed.  No other surveillance of NEWELL, who lives in Oregon, has been conducted to date.

216.   MORENO-FERNANDEZ is believed to reside in both San Diego, California and Mexico; however, agents have been unable to identify his residences at either location.  A number of surveillances of MORENO-FERNANDEZ have been conducted by DEA agents in California in connection with meetings set up by CW-2 in the summer and fall of 2002 as discussed in more detail above.  A review of telephone records for a wireless telephone used by MORENO-FERNANDEZ during the course of the San Diego wiretap indicated that in February and March 2002 that telephone was roaming through Illinois, Wisconsin, Colorado, New Mexico, and Los Angeles.  I have spoken with one of the case agents from the MORENO-FERNANDEZ and he advised me that they do not know of MORENO-FERNANDEZ's current whereabouts.

217.   As previously discussed ▮▮▮▮▮▮▮▮▮▮ s observed at WALTER's Marathon Party.

218.   There has been no surveillance of the other Targets (namely, BALDINI, GRAHAM and WRIGHT) during this investigation.  Although DEA has information from various confidential

00085

sources that each of these Targets have been involved in distributing and/or buying marijuana, the investigation to date has not revealed what each of their current roles is in the conspiracy. Moreover, DEA has neither received any information regarding any planned meetings or distributions involving these Targets nor have any of the three yet been identified as participants in the events leading to the NEWELL seizure on January 24th, WALTER's Marathon party or any of WALTER's controlled meets with CW-1. That is to say, although the investigation has revealed that they are likely to be intercepted on Target Telephone 1 and have had drug dealings with WALTER and/or other Targets, there is no present information to suggest that physical surveillance of BALDINI, GRAHAM or WRIGHT would be fruitful or would advance the goals of this investigation. In addition, at least as to WRIGHT, DEA does not know where he is currently residing.

219.    Even if agents were able to surveill all of the Targets on a regular basis (which is not feasible without jeopardizing the investigation), without the benefit of the wire intercepts, such surveillance is unlikely to develop sufficient evidence regarding, for example, when marijuana was being transported to Massachusetts, how it was being transported, who was transporting it, who the source was, who the intended recipients were, the state of mind and role of those involved in these activities, and how the drug proceeds were disposed of.[12] For another example, even if agents were



(73)

able to surveill the Targets meeting with suspected sources of supply, associates and customers, mere surveillance of such meetings would not provide evidence of the state of mind and knowledge of the individuals engaged in such meetings.

220.    Moreover, a number of the addresses associated with the Targets are in residential areas or mixed neighborhoods with numerous businesses and residential buildings, and there is a lot of pedestrian and motor vehicular traffic in that area. Accordingly, it would very difficult to conduct stationary surveillance without constantly rotating numerous vehicles. Rolling surveillance is of limited value because it provides little opportunity to observe the activity occurring at the target location. I believe that prolonged physical surveillance might alert the Targets and their associates to the existence of the investigation, which could frustrate the goals of this investigation.

221.    Even if more intense physical surveillance were not so risky, I do not believe that physical surveillance would provide me with the type of information I feel is necessary to satisfy the goals of this investigation. For example, physical surveillance might permit agents to observe WALTER or other Targets meeting with someone outside of a residence, on the street, or inside a car. However, surveillance of a meeting between two or more subjects does not provide essential information such as the topic of the meeting, the roles of the participants, or what occurred at the meeting. Based on my experience, narcotics being exchanged is often concealed in an outer packaging and, therefore, would not be recognized by a surveillance team, even if an actual exchange was observed. Surveillance rarely provides information such as the amount or price of narcotics being exchanged.

222.    Physical surveillance thus has limited value if not used in conjunction with other techniques such as electronic surveillance. The continued use of surveillance likely will not enlarge

(74)

on the available information. Rather, prolonged or regular surveillance of the Targets' movements likely would be noticed and could cause them to become more cautious in their illegal activities, to flee, to threaten the safety of cooperating witnesses, or to otherwise compromise the investigation. This is especially true of these Targets given the extreme counter-surveillance measures engaged in by members of this long-standing conspiracy, including the use of payphones, pre-paid calling cards, wireless telephones and voice mail boxes to avoid identification of the telephones they are using in furtherance of their drug trafficking, using telephones subscribed in third parties' names, false or fictitious names and addresses or false or fictitious business names, rotating rental vehicles, and suspected use of electronic counter-surveillance devices and counter-surveillance techniques.[13]

223.    Accordingly, physical surveillance is not likely to be sufficient, unless combined with electronic surveillance, to achieve the goals of this investigation.

## E.    INTERVIEWS OF SUBJECTS OR ASSOCIATES

224.    For many of the same reasons that the service of grand jury subpoenas and physical surveillance would not result in success, I also believe that witness interviews would fail to produce the evidence needed to accomplish the stated goals of this investigation.

225.    Based upon my experience, I believe that interviews of subjects or their known associates would produce insufficient information as to the identities of all persons involved in this

---

[13] While analysis of the trap and trace information from the BANNERMAN former voicemail box in connection with physical surveillance did allow agents to identify a suspected drug courier, NEWELL, it was still insufficient to develop direct evidence regarding WALTER and BANNERMAN's specific role (or the role of any other Targets) in the shipment or provide information regarding the identity of the source of supply, the identities of the intended recipients of the marijuana and the ultimate disposition of the marijuana.

(75)

conspiracy. Interviews are unlikely to reveal other necessary information for this investigation. I believe that any responses to interviews would contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation. Additionally, such interviews would have the effect of alerting the members of the conspiracy about the investigation, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to the cooperating witnesses and confidential informants should their identities or existence become known to the subjects of the investigation.

226.    Interviews with some potential witnesses would also be unproductive because such interviews would not be likely to achieve the goals of identifying the participants in the Massachusetts drug distribution network, the manner and means of their drug distribution. Only limited numbers of people have access to this important information, and it is highly doubtful that those privy to this knowledge would truthfully disclose it to law enforcement in an interview.

F.    **SEARCH WARRANTS**

227.    The execution of search warrants on various locations in this investigation has been considered, and at the end of this investigation, will undoubtedly be pursued. However, at this time, there is no clear evidence as to where any of the Targets' stash houses or storage facilities are located. For example, although there are three addresses associated with WALTER, the investigation has not revealed which of these addresses he may be using as a residence(s) or which he may be using as stash house(s). Based upon my training and experience, drug traffickers do not often keep bulk quantities of marijuana at their residences not only because they fear law enforcement detection, but because the marijuana has a strong, detectable odor. WALTER suggested

(76)

as much when he instructed CW-1 during their May 22nd meeting to get the five pounds of marijuana out of its residence because it stunk.

228.    Moreover, the whereabouts and current residences of many of the Targets are also unknown. Thus, the execution of search warrants at this point in the investigation would not result in the seizure of a considerable quantity of narcotics, relevant documents or other evidence. Based on my training and experience, I know that narcotics traffickers frequently keep stores of narcotics at "stash locations" that are separate from their personal residences. Based on my training and experience, I believe that this behavior suggests that the subjects may not be keeping large quantities of drugs at their personal residences. At this point in the investigation, the locations where important evidence may be found in Massachusetts and California have not been identified fully.



229.    I have also considered and rejected the use of trash searches in this investigation because they are not feasible at a number of locations and they are not likely to satisfy the goals of this investigation. In terms of the feasibility of such searches, for example, they are not feasible at two of the addresses associated with WALTER — the Gardner Street address and K Street in South Boston — because each is a multi-family dwelling where it would be difficult to segregate trash deposited by WALTER from the trash deposited by others. The physical act of trying to identify WALTER's trash from that of his neighbors poses the risk of detection by WALTER or a neighbor who might alert WALTER to the agents' activities. Removing all of the trash from those residences

for inspection at a remote location might run the risk that someone would notice that the trash is missing. Such searches also are obviously not feasible where the actual residence of the Target is not currently known as is the case with a number of the Targets. Even if such searches are more feasible at some locations (for example, single-family, private residences), they will not provide sufficient information to satisfy the goals of this investigation. Although trash searches may lead to valuable financial information (culled from receipts, envelopes and bills, for example), their contents are unlikely to reveal evidence of the Targets' sources of supply, current customers or the nature of their roles in the drug trafficking operation. For these reasons, and for the time being, I have decided not to employ trash searches as part of this investigation.

230. DEA has, however, already sought and executed two search warrants on BANNERMAN's former voicemail box in the course of this investigation (in April 2003 and again, in June 2003). The execution of the first search warrant, as previously discussed, resulted in the disclosure of CW-2's message to BANNERMAN. The execution of the second search warrant resulted in the disclosure of three voicemail messages: one that was a hang-up call from a number assigned to a payphone located at 555 63rd Street in Brooklyn, New York; a second message from (808) 283-0236 subscribed to by Richard Rodriguez, 805 Wilshire Boulevard, Santa Monica and which asked "Dutch" (BANNERMAN's nickname according to CW-2) to call him and that he looked forward to seeing BANNERMAN or talking to him and signed off by saying "Aloha" (I note that the Rodriguez telephone previously had contact with MORENO-FERNANDEZ's wireless telephone on four occasions between October 23, 2002 and October 28, 2002); and a third message for which there was no trapped telephone number from the pen register data and which was largely inaudible, but involved a male caller whose last few words of the message sounded to be "...fucking

(78)

heroin." Although the execution of these two search warrants revealed the substance of the messages, a search warrant for voicemail messages may only be executed on a one-time basis. That is, only an authorized interception of communications over the course of thirty days will provide the context for the communications between the Targets and their associates and led to fulfilling the goals of the investigation. The usefulness of the search warrants on BANNERMAN's voicemail box was further limited by the fact that they involved only one-way communications because the box only receives incoming calls and not the return calls that BANNERMAN might make in response after retrieving any of these messages. Moreover, WALTER uses Target Telephone 1 so frequently (unlike BANNERMAN's use of his former voicemail box that has tapered off after the NEWELL seizure) that the execution of a search warrant on the voicemail box of Target Telephone 1 is unlikely to result in the seizure of many stored or unopened voicemail messages.

231.    In addition, the execution of search warrants at this point in the investigation is likely to fail to reveal the total scope of the criminal operation and the identities of the co-conspirators. Moreover, it is unlikely that all of the principals of this organization would be at any one location when a search warrant was executed. Accordingly, even if large quantities of controlled substances were discovered as a result of the execution of search warrants, it is unlikely that the execution of search warrants, without additional evidence obtained from the interception of wire communications, would result in sufficient evidence to prosecute all culpable individuals, such as the conspirators' drug distribution customers.

232.    I believe that search warrants executed at this time would be more likely to compromise the investigation by alerting the principals of the investigation, thereby allowing unidentified co-conspirators to insulate themselves further from successful detection, as well as to

(79)

otherwise frustrate the purposes of this investigation. Search warrants will almost certainly be appropriate later in the investigation. At present, however, the interception of wire communications is necessary to maximize the future effectiveness of search warrants and to link the drug suppliers and distributors to any contraband recovered as a result of those searches.

## G.   PEN REGISTERS AND TELEPHONE TOLL RECORDS

233.    DEA has utilized information from telephone toll records, pen registers and trap and trace devices. The information has been useful in verifying frequent telephone communication between Target Telephone 1 and other telephones and pagers. This information indicates that there has been considerable contact between certain communications facilities used by the Targets, and has verified a very high volume of telephone activity on Target Telephone 1. In almost every other respect, however, the information obtained from these devices and toll analysis has proven to be of limited value.

234.    A pen register is capable of recording every number that is dialed or pulsed from a target telephone. Generally speaking, a pen register produces a list of the telephone numbers called from a particular telephone by date and time. As different telephone numbers are recorded by a pen register, investigating agents obtain information from the telephone company concerning the subscribers of those numbers. Subscriber information alone, however, does not reveal who is making the calls and the information does not reveal to whom the calls are being placed. Most importantly, absent the authority to intercept the wire communications made from Target Telephone 1, the substance of the calls is not known. In addition, trap and trace devices register the numbers' of telephones calling into a particular telephone. However, given that the Targets of this investigation frequently use pay telephones and telephones subscribed in false names, this

(80)

information is of limited use in ascertaining the identity of the callers into Target Telephone 1. Moreover, trap and trace devices provide no information as to the content of these calls.

235.    Similarly, telephone toll information, which identifies the existence and length of telephone calls placed from a given telephone to telephones located outside of the local service zone, also yields limited information. Telephone toll information is not available for local telephone calls on residential telephones and is generally available only on a monthly basis. Moreover, the same limitations that apply to pen register information apply to telephone toll information.

236.    Additionally, evidence obtained through these tools cannot identify the source or sources of controlled substances, nor can it, by itself, establish proof of a conspiracy.

237.    Analysis of trap and trace information did allow DEA to identify NEWELL as a suspected marijuana/money courier and lead to the seizure of over $220,000. However, even this technique was of limited value, in that it did not provide sufficient information to allow DEA to locate NEWELL in time to observe his movements upon his arrival in Massachusetts. Indeed, I believe that NEWELL distributed a substantial quantity of marijuana before we were able to locate him. Moreover, actual surveillance of NEWELL was of limited value even after he was located. For example, although agents observed WALTER meet with NEWELL and hand him a bag, surveillance alone was insufficient to determine the extent of WALTER's knowledge of, and role with respect to, the purpose of NEWELL's trip.

238.    In sum, I believe that the interception of wire communications is an essential investigative means for obtaining evidence of the offenses in which the Targets and others as yet unknown are involved.

(81)

VIII. PRIOR APPLICATIONS

239.    On June 23, 2003, I requested a check of the DEA, FBI and Bureau of Immigration and Customs Enforcement ("BICE") electronic surveillance indices to determine whether any previous applications had been made to any judge for authorization to intercept, or for approval of interception of, oral, wire or electronic communications of any of the same Targets, facilities, or places specified in the application accompanying this affidavit. I was advised by DEA Headquarters (that conducted the check) on June 26, 2003 that neither the DEA, FBI nor BICE indices showed any prior applications filed with regard to Target Telephone 1 or regarding the locations at which Target Telephone 1 is located. On the same dates, I was advised that no prior applications have been made with respect to any of the Targets of this investigation except as follows. IVAN MORENO-FERNANDEZ was listed as a named interceptee in connection with prior wiretap applications filed in the Southern District of California for six telephones associated with Pedro Alvarez.[14] In particular, he was listed as a named interceptee for wiretap orders that were issued by a federal district court in San Diego for the periods from August 10, 2001 through September 5, 2001; September 6, 2001 through October 4, 2001; October 5, 2001 through November 2, 2001; November 3, 2001 through November 29, 2001; November 30, 2001 through December 28, 2001; January 22, 2002 through February 20, 2002; and March 28, 2002 through April 24, 2002. (MORENO-FERNANDEZ was not listed as a named interceptee on the first of the wiretap orders issued for the Alvarez telephones on July 13, 2001, but was listed as a named interceptee, in the name FNU LNU (a/k/a "Brocco" or "Broccoli") or Ivan LNU, for the subsequent

--------

[14]These wire intercepts did not provide information about Targets other than MORENO-FERNANDEZ nor about MORENO-FERNANDEZ's connections with the other Targets.

(82)

orders as listed above). During the course of these wiretaps, MORENO-FERNANDEZ was only intercepted on two of the six telephones associated with Pedro Alvarez.

240. On July 1, 2003, I consulted the Massachusetts State Police ("MSP") to determine whether any previous applications had been made to any judge for authorization to intercept, or for approval of interception of, oral, wire or electronic communications of any of the same Targets, facilities, or places specified in the application accompanying this affidavit. I was advised by the MSP on July 14, 2003, that there were no prior applications filed with regard to Target Telephone 1 or regarding the locations at which Target Telephone 1 is located. On the same dates, I was advised that no prior applications have been made with respect to any of the named targets of this investigation except as follows.

## IX. MINIMIZATION

241. All wire communications intercepted will be minimized in accordance with Chapter 119, Title 18, United States Code. The monitoring of wire interceptions to and from Target Telephone 1 will be suspended when it is determined through voice identification, physical surveillance or otherwise, that none of the subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already monitored that the conversation is criminal in nature. Even if the named interceptees are participants

---

These wire intercepts did not provide information about Targets other than ████ nor about ████ connections with the other Targets.

(83)

in a conversation, monitoring will be suspended if the conversation is non-criminal in nature. After minimization, monitoring agents will spot check to determine whether the conversation has become criminal in nature.

242.    The monitoring of all wire communications will be recorded and examined by the monitoring agents or attorneys to determine the relevance of the intercepted communications to the pending investigation and disclosure of the contents or nature of the communications will be limited to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code.

243.    To the best of my knowledge, WALTER has a state criminal charge pending against him in Florida. All monitoring agents will be instructed to minimize all conversations involving an attorney and a party represented by that attorney if the conversation pertains to the represented party's culpability in relation to an indictment or charges against him or the strategy which he contemplates employing in his defense of such charges. In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

## X.    TERMINATION

244.    This narcotics and money laundering conspiracy involves numerous individuals who have engaged in a protracted and continuing course of conduct. Those individuals also appear to perform diverse functions in furtherance of the conspiracy. Given these factors, it is necessary that the interception process not automatically terminate when communications of the kind described are first intercepted. Rather, the interception process should continue until attainment of the authorized

(84)

objectives, or in any event, at the end of thirty (30) days, measured from the earlier of the day on which the investigative or law enforcement officers first begin to conduct the interceptions under the Court's order or ten days after the date the order is entered.

245.    I submit that the authorization should apply to the interception of wire communications to Target Telephone 1--telephone number (617) 901-0104 and over any changed telephone number subsequently assigned to the wireless telephone bearing electronic serial number C12C1FEA as well as over any changed electronic serial number assigned to telephone number (617) 901-0104--within the thirty (30) day period authorized by the Court's order.

246.    I submit that the authorization should apply to background conversations intercepted in the vicinity of Target Telephone 1 when the telephone is off the hook, activated or otherwise in use.

247.    I have signed this affidavit under oath, and state that the assertions and allegations in this affidavit are true and correct to the best of my knowledge, information and belief.

Brian Tomasetta
Special Agent,
Drug Enforcement Administration

Sworn and subscribed to before me this 21st day of July 2003, at Boston, Massachusetts.

UNITED STATES DISTRICT JUDGE

(85)

00098

## CERTIFICATE OF SERVICE

I, James Michael Merberg certify that I have this 19th day of November 2004 served a copy of the foregoing Motion to Suppress Evidence Produced by Wiretap Orders, and Factual and Legal Memorandum in support thereof by mailing same postage prepaid to the following individuals:

Rachel E. Hershfang, Esquire
Office of the United States Attorney
For the District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Kevin J. Reddington, Esquire
Kevin J. Reddington Law Office
1342 Belmont
Brockton, MA 02169

John T. Diamond, III, Esq.
15 Foster
Quincy, MA 02169

Adam A. Rowe, Esquire
Crowe & Dunn, LLP
141 Tremont Street
Boston, MA 02111

Mary Page Kelley, Esquire
Federal Defenders Office
408 Atlantic Avenue
Boston, MA 02109

William J. Cintolo, Esquire
803 Hancock
Box 189
Quincy, MA 02170

Debra A. DelVecchio
DelVecchio & Houseman
Perry Building
15 Front Street
Salem, MA 01970

Dated: November 19, 2004

James Michael Merberg