UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )    No. 03-10370-DPW
        v.                    )
                              )
1. DOUGLAS BANNERMAN,         )
                              )
        Defendant.            )

### GOVERNMENT'S OPPOSITION TO DOUGLAS BANNERMAN'S MOTION TO SUPPRESS EVIDENCE OBTAINED PURSUANT TO WIRETAP

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorney Rachel E. Hershfang, hereby opposes Douglas Bannerman's ("Bannerman") motion to suppress evidence obtained pursuant to a wiretap. Various codefendants have sought the Court's permission to join in this motion; to the extent those efforts are successful, this opposition applies to them, as well.

Bannerman's broadside on the wiretap is based on an alleged lack of "necessity" -- that is, Bannerman claims that the affidavit submitted by DEA Special Agent Brian Tomasetta in support of the requested interception fails to establish that traditional investigative methods have failed, as required by Title 18, United States Code, Section 2518(1)(c). Variously claiming that the affidavit intentionally omits DEA's achievements in the investigation, that it is false, and that it establishes successes, rather than failures, Bannerman seeks to suppress the evidence obtained pursuant to the court order issued

1

on the basis of the affidavit.  Bannerman attacks only the first affidavit, noting that "if the initial wiretap authorization was unlawful, all subsequent interception authorizations ... would similarly be unlawful[.]"  Defendant's Memorandum in Support of Motion to Suppress ("Def. Mem.") at 1.  This response, therefore, will focus solely on that initial affidavit's success in establishing "necessity," as required by law.[1]

Contrary to Bannerman's assertions, the affidavit submitted in support of the wiretap amply established that a wiretap was warranted.  Judge Tauro's issuance of the order allowing the wiretap was supported by facts that were more than "minimally adequate" to establish that interception was appropriate.  As set forth more fully below, this motion must be denied.

## I.    Facts: Charges; the Investigation Before the Wiretap.

Bannerman is charged, along with other defendants, in Count One of a six-count Superseding Indictment.  That Count alleges that Bannerman and others participated in a conspiracy to possess with intent to distribute, and to distribute, marijuana, over an approximately one-year period (from January, 2003 to December, 2003).  This indictment arose from a long-term investigation by Drug Enforcement Administration ("DEA") Special Agent Brian

---

[1]It is not entirely clear what evidence Bannerman seeks to suppress.  There are passing references both to intercepted statements and to a search of his apartment (pursuant to warrant) at the time of his arrest.

Tomasetta ("Agent Tomasetta"), DEA Special Agent Dennis Barton
("Agent Barton"), and others into a cross-continental drug-
trafficking organization.  During the course of the
investigation, DEA cultivated four cooperating witnesses, as well
as two (nontestifying) confidential informants, each of whom
provided information about one or more of the anticipated
interceptees or targets of the investigation.  Each of these
cooperating witnesses and confidential informants is discussed in
the Affidavit of Special Agent Brian Tomasetta, sworn on July 21,
2003 ("Tomasetta Affidavit" or "Tomasetta Aff."), in support of
the application for an order authorizing the interception of wire
communications on an AT&T wireless telephone responding to (617)
901-0104, subscribed in the name of Kurt Walter ("Target
Telephone 1" or "TT1").

     As described in the Tomasetta Affidavit (¶¶54-69), a break-
through in the local investigation came on January 24, 2003, when
agents combined pen register/trap and trace information,
traditional investigative tactics, and good luck to find Gary
Newell ("Newell"), a target of the investigation, in Cambridge,
Massachusetts.  DEA was monitoring the phone traffic to a
voicemail box believed to be used by Bannerman.  Between January
20 and 22, 2003, DEA noticed incoming calls to this voicemail box
from Lakewood, Colorado (where the phone was located at a Holiday
Inn); Boonville, Missouri; and Medina, Ohio.  Agents were able to

confirm that someone named Gary Newell, driving a truck with Oregon plates, had stayed at the Holiday Inn in Lakewood on January 20, 2003. During the same time period that these calls were coming into the voicemail box, DEA also saw multiple calls from pre-paid calling cards associated with Bannerman (though not held in his name), and deduced that Bannerman was retrieving messages left by the person (Newell) moving from west to east across the country.

In the morning of January 24, 2003, DEA set up surveillance on a Holiday Inn in Cambridge. There, they saw a pick-up truck with Oregon plates in the parking lot. Eventually, Newell was seen in the truck. Agents followed him to the Lechmere Auto Wash, where he met briefly with Kurt Walter ("Walter"), another target, who threw a duffel bag into the truck. When Newell left the area, he was followed and stopped. A subsequent search of the truck revealed Federal Express boxes containing over $220,000 in cash, as well as tarps with marijuana residue on them, but no drugs. Newell was not arrested. Shortly after he left the scene, the Bannerman voicemail box received an incoming call from a payphone at 14 McGrath Highway, near the Holiday Inn where Newell had been seen (and where, records showed, Newell had stayed).

As the Tomasetta Affidavit explains, Newell was believed to have delivered a load of marijuana to the Boston area before

4

agents were able to locate him.  The money seized from his truck was believed to be a payment (likely partial) for the already-delivered drugs.[2]

The Newell seizure represented an important confirmation of DEA's suspicions that Bannerman, Walter, and others were involved in marijuana dealing.  It was, however, of limited investigative value.  Contacts with Newell appeared to cease after the seizure; Newell himself did not cooperate; and no marijuana was seized.

The next important series of investigative steps were taken with the help of a cooperating witness ("CW-1") who came to DEA's attention after the execution of a search warrant on his[3] house in May, 2003.  Tomasetta Aff. ¶77.  As described in that affidavit, CW-1 was recruited in connection with charges, stemming from Oregon, that he was involved in marijuana trafficking.  Tomasetta Aff. ¶¶77-78.  Under DEA supervision, CW-1 had a series of consensually recorded, monitored, and

_____

[2]Despite his having been identified as a likely interceptee in the Affidavit (see Tomasetta Aff. ¶¶24-25), DEA knew by July, 2003 that Newell had become *persona non grata* with the co-conspirators.  Kurt Walter had mentioned to one of the cooperating witnesses (referred to in the Tomasetta Affidavit as "CW-1") that there had been a seizure from one of their drivers, who came from Oregon, and that contacts with that person had been cut off.  Tomasetta Aff. ¶146.  These references are believed to have been to Newell.

[3]For ease of reference, and to avoid tortured grammar, all cooperating witnesses will be referred to with the masculine pronoun throughout this memorandum, without regard to whether the cooperating witness is male or female.

surveilled meetings with Kurt Walter, beginning in May, 2003 and continuing until late June, 2003. Tomasetta Aff. ¶¶93-150. These meetings allowed DEA to monitor CW-1's payments to Walter of drug proceeds for marijuana that Walter had earlier "fronted" (provided on consignment) to CW-1. CW-1 also, at DEA's direction, bought additional quantities of marijuana from Walter.

CW-1 also provided DEA with historical information about his (former) status as Walter's marijuana supplier, which began around September, 2001 and continued until January, 2003, when CW-1's own source (his cousin) was caught by police and stopped supplying CW-1 with marijuana. Tomasetta Aff. ¶¶80-84. CW-1 explained to DEA agents that, at that time (beginning in about February, 2003), Walter had become his supplier. Tomasetta Aff. ¶¶85-86. (This initial supply of marijuana from Walter may well have come from the Newell delivery believed to have taken place before January 24, 2003; however, since CW-1 was not known to DEA at that time, there was no opportunity to attempt to have CW-1 obtain that information from Walter.)

Other cooperating witnesses provided DEA with historical information about Bannerman, see Tomasetta Aff. ¶¶154-162 (CW-2 describes dealings with Bannerman dating back to the summer of 2000, ending by February 25, 2003, when Bannerman stopped returning CW-2's telephone calls); about a person whose name was redacted from the affidavit to preserve a then-ongoing

6

investigation,[4] see Tomasetta Aff. ¶¶163-166 (CW-3 identified
Clark as a marijuana customer and source of supply; described him
as source for marijuana dating back to the late 1990s); and about
Gary Milo ("Milo"), another target of the investigation, see
Tomasetta Aff. ¶167 (CW-4 identified Milo as his marijuana source
for six to ten loads of marijuana, beginning around the fall of
2001).

     In addition to the cooperating witness information, DEA
worked with two "confidential informants" (people who provided
information, but were not willing to testify).  One of these
people ("CI-1") told DEA the phone number for Target Telephone 1,
see Tomasetta Aff. ¶¶15,73, but was not otherwise of great
assistance.  The other confidential information ("CI-2") was
someone believed by DEA to have credibility problems (see
Tomasetta Aff. at 63 n.22) who had no prior relationship with any
of the targets.  Tomasetta Aff. ¶192.  DEA tried to use CI-2 to
infiltrate the target organization, by sending him to hang out at
a Marathon Day party hosted by Walter, but was unsuccessful.
Although Walter and CI-2 made contact and talked, Walter refused
when asked to give his phone number to CI-2.  Tomasetta Aff.
¶¶74-76.

     As set out in the Tomasetta Affidavit, DEA also set up pen

_____

     [4]This person, who has subsequently been indicted in a
separate case, is John Clark.

7

register/trap and trace devices on a number of telephones and voicemail boxes believed to be associated with the individuals who were being investigated.  These devices were occasionally quite helpful -- most obviously in connection with the Newell seizure -- but had limited utility, as they did not provide information about who was making or receiving the call, or the nature and content of the call.

By the time Judge Tauro was asked to issue an Order, in July, 2003, it had been approximately six months since the seizure of funds from Gary Newell.  DEA had managed to make direct, monitored contact (though CW-1) with Walter in the intervening months, and obtain evidence sufficient to charge Walter with marijuana offenses.  DEA had not, however, achieved such success against any other target (with the possible exception of Newell).  And, as set out in the Tomasetta Affidavit, DEA had not yet fully identified the extent of the conspiracy, nor its money laundering activities; the identities of accomplices and conconspirators; and practical information such as where the targets lived, met, and did their drug dealing.  Indeed, getting this (and other) information was described in the Tomasetta Affidavit as the goal of the hoped-for wiretap interception.  Tomasetta Aff. ¶181.

The Tomasetta Affidavit, from which Judge Tauro concluded that the Order authorizing the interception of Target Telephone 1

should issue, detailed all these efforts and more.  Tomasetta
Aff. ¶¶52-180.  Agent Tomasetta then described DEA's current
goals, Tomasetta Aff. ¶181, and meticulously documented his
reasons for believing that normal investigative procedures --
including cooperating witnesses, confidential informants,
physical surveillance, grand jury subpoenas, witness interviews,
search warrants, and toll analysis -- had failed, reasonably
appeared unlikely to succeed if tried, or were too dangerous, id.
¶¶181-238.

On July 21, 2003, the Honorable Joseph L. Tauro approved the
government's application and issued an order authorizing the
government to intercept communications over Target Telephone 1
for a period of 30 days (the "Wiretap Order").  Judge Tauro made
a specific finding that "normal investigative procedures have
been tried and have failed, reasonably appear unlikely to succeed
if tried, or are too dangerous."  Wiretap Order at 3; see 18
U.S.C. § 2518(1)(c).  Judge Tauro also specifically found
probable cause that Target Telephone 1 was being used by
individuals named in the Wiretap Order, as well as by "others as
yet unknown," to further drug and money laundering crimes.  Id.
at 1.

## II.  Argument: Necessity Was Established in the Tomasetta Affidavit, as Judge Tauro Found.

### A.  Standard of Review.

Title III states that a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  The First Circuit has repeatedly "interpreted that provision to mean that the statement should demonstrate that the government has made 'a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to'" a wiretap.  United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003) (quoting United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)).  The First Circuit has also emphasized that

> the government does not need to exhaust all other investigative procedures before resorting to wiretapping.  Nor must ordinary techniques be shown to have been wholly unsuccessful.  Rather, the district court must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence -- to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable.

United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir.) (citing cases), cert. denied, 477 U.S. 908 (1986); accord Villarman-Oviedo, 325 F.3d at 9.  Put another way,

> An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley.  It is enough that reasonable efforts to succeed

10

> without such assistance have been tried and
> failed, and that electronic surveillance
> seems a suitable next step in a plausible
> progression.

United States v. David, 940 F.2d 722, 729 (1st Cir.), cert.

denied, 502 U.S. 989 (1991); accord United States v. Corrado, 227

F.3d 528, 539 (6th Cir. 2000) (holding that purpose of section

2518(1)(c) "is not to foreclose electronic surveillance until

every other imaginable method of investigation has been

unsuccessfully attempted, but simply to inform the issuing judge

of the difficulties involved in the use of conventional

techniques") (citation and internal quotation marks omitted).

A district judge who reviews a wiretap application in the

first instance must not, the First Circuit has cautioned, apply a

"rigid or rule-oriented" approach to the application's adequacy.

David, 940 F.2d at 728.  On the contrary, "'Title III demands a

practical, commonsense approach to exploration of investigatory

avenues and relative intrusiveness.'" Id. (quoting United States

v. Urib, 890 F.2d 554, 556 (1st Cir. 1989)).  That is especially

true where the wiretap investigation targets a drug organization:

"Because drug trafficking is inherently difficult to detect and

presents formidable problems in pinning down the participants and

defining their roles, investigative personnel must be accorded

some latitude in choosing their approaches." David, 940 at 728.

A district judge asked to review *another* district judge's

decision to approve a wiretap application has an even more

limited role: "The reviewing court examines the face of the affidavit and 'decide[s] if the facts set forth in the application were *minimally adequate* to support the determination that was made.'" Villarman-Oviedo, 325 F.3d at 9 (emphasis added) (quoting United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989)).  Thus, it is not the role of the reviewing judge to second-guess the issuing judge, or to ask whether he himself would have issued the warrant, but rather to determine if the issuing judge's decision was reasonable.  See United States v. Lopez, 300 F.3d 46, 53 (1st Cir. 2002).

**B.    The Facts Set Forth in the Tomasetta Affidavit Were More than Minimally Adequate to Support Judge Tauro's Determination That Section 2518(1)(c)'S Requirements Had Been Met.**

Bannerman claims that the facts in the Tomasetta Affidavit were not even minimally adequate to support Judge Tauro's determination that "normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous."  His arguments, conclusorily presented, seem to fall into under the general rubric that the government could have achieved any remaining legitimate goals using normal investigative means, rendering Judge Tauro's decision to issue a wiretap warrant unreasonable. Def. Mem. 1-4. This argument appears to fall into two parts: (a) that the government could have achieved its goals using normal

12

investigative means that it had already employed with success, and (b) that Agent Tomasetta downplayed those successes and/or misled Judge Tauro with respect to some of the shortcomings of normal investigative means, including a cooperating witness' ability to fully identify Kurt Walter and physical surveillance.[5] See Def. Mem. 5-6, 9.

Bannerman's motion is without merit and should be denied. As a general matter, he disregards the standard of review that Judge Tauro was required to apply to the government's application and that this Court is required to apply to Judge Tauro's determination.  The question for Judge Tauro was not, as Bannerman implies, whether normal investigative procedures had proven wholly unsuccessful or had been completely exhausted, see Abou-Saada, 785 F.2d at 11, but simply whether, in light of the facts set forth in the Tomasetta Affidavit, electronic surveillance was "a suitable next step in a plausible

---

[5]In support of these claims of untruthfulness, Bannerman cites generally to "DEA-6 reports," without specifying (by Bates number, for example, and paragraph) the purportedly impeaching information.  Bannerman's goals in this effort are not at all clear.  He has not moved for a Franks hearing, nor has he come anywhere near the neighborhood of justifying one.  A Franks hearing is required "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."  Franks v. Delaware, 438 U.S. 154, 155 (1978).  Without specific, allegedly impeaching information, it is not possible to respond to these libelous claims.

progression" of investigative techniques, <u>David</u>, 940 F.2d at 729.
Similarly, the question for this Court is only whether the facts
in the Tomasetta Affidavit were "minimally adequate" to support
Judge Tauro's determination.  <u>Villarman-Oviedo</u>, 325 F.3d at 9.

    Applying these standards of review, there is no basis to
suppress the fruits of the wiretap.  Agent Tomasetta, in a
lengthy affidavit, provided a detailed account of the
investigation's successes.  He then set out the goals of the
ongoing investigation and documented in detail the ways in which
those goals had not been met, contradicting Bannerman's claim
that the investigation's pre-wiretap successes forbade the
issuance of a wiretap warrant or, alternatively, required that
DEA continue pursuing the investigation through those same
traditional means.  The Tomasetta Affidavit explained in great,
case-specific detail the reasons why previously-used normal
investigative procedures were unlikely to achieve the
investigation's remaining goals, and also why other normal
investigative procedures were likely to fail or prove too
dangerous.  Tomasetta Aff. ¶¶181-238.  These explanations were at
the very least minimally adequate to support Judge Tauro's
determination that the Order should issue.  By issuing the Order,
Judge Tauro indicated his agreement with Agent Tomasetta's
assessment and decided that electronic surveillance was "a
suitable next step in a plausible progression" of investigative

steps.  David, supra, 940 F.2d at 729.

Below, the facts that were before Judge Tauro are outlined
briefly.

1. **Cooperating witnesses.**  Bannerman makes much of
the four cooperating witnesses that DEA cultivated during this
investigation.  Def. Mem. 1-5, 9, 10.  What Bannerman ignores is
that all of this information was before Judge Tauro.  The
Tomasetta Affidavit made no attempt to minimize the various
cooperating witnesses' successes, both proactive and historical;
instead, fully 29 pages of the affidavit are devoted to detailing
those successes.  Tomasetta Aff. ¶¶77-152.  Agent Tomasetta also
explained, however, why each cooperating witness probably could
not achieve the investigation's remaining goals on his own.  Id.
¶¶186-197.

a. **CW-1's Limitations**.  For example, the
Tomasetta Affidavit noted that, although CW-1 had succeeded in
making consensually monitored calls, money payments, and drug
buys from Walter, "CW-1 does not know Walter's true name," but
knows Walter as "Cort," and does not know where Walter lives.[6]

---

[6]Bannerman seems to try to cast doubt on the accuracy of
this statement, citing generally to "the DEA-6 reports (including
surveillance activity), which including information concerning
Walter's background, where he resides, the type of vehicle he
operates, and the telephone he utilizes."  Def. Mem. 4-5.
Bannerman also points out that Agent Tomasetta identified Walter
by name and residential address (though he is wrong about the
latter -- see Tomasetta Aff. ¶¶204-206 -- before the wiretap, DEA
did not know where Walter lived).  Bannerman seems to confuse CW-

Id.  In addition, the Tomasetta Affidavit explains that, although CW-1 was himself a former marijuana supplier of Walter's, he "is not aware of Walter's current supplier(s) or any other drug supplier(s) that he has had in the past."  Id.   And, the Tomasetta Affidavit points out, as a customer himself, CW-1 had no information about Walter's other customers (other than one former customer, identified in the affidavit).  Id.  The Tomasetta Affidavit also reiterated that Walter was reluctant even to provide CW-1 with information about the person that Walter had retained to collect CW-1's own outstanding drug debt, and deduced that Walter would be equally unwilling to share information about others he was involved in the marijuana business with.  Id.

Bannerman also ignores CW-1's inherent limitations in achieving the investigation's stated goal of obtaining evidence sufficient to convict all conspiracy members.  As a cooperating witness with an imminent pending case (see Tomasetta Aff. ¶78) who stood to gain from his cooperative efforts, CW-1 was open to impeachment on this ground at trial.  Courts have recognized that wiretaps are an appropriate way for the government to obtain

---

1 with all of DEA.  Agent Tomasetta did not claim in his affidavit that DEA had been unable to identify Walter, a claim that would be patently ridiculous in the face of efforts to tap Walter's phone.  Instead, Agent Tomasetta was describing CW-1's limitations, and stating that CW-1's ability to learn more about Walter was limited.  See Tomasetta Aff. ¶186.  Nothing in Bannerman's generalized attack casts doubt on this proposition.

corroborating evidence of crimes.  See, e.g., United States v.
Bennett, 219 F.3d 1117, 1122-23 (9th Cir. 2000) (rejecting
argument that "the informant Chambers's ability and willingness
to participate in the investigation indicates that further use of
this traditional technique could have been productive and
nullifies the government's plea of necessity" in part because
"Chambers's credibility as a paid government informant would be
under attack and would therefore require further corroborating
evidence") (citing cases).

    Based on the facts set forth in the Tomasetta Affidavit,
Judge Tauro could reasonably have concluded that, despite CW-1's
past successes, he would not be able to achieve the
investigation's remaining goals on his own.

        **b.   CW-2's Limitations.**  As the Tomasetta
Affidavit explains, CW-2 was someone who had known Bannerman
since the end of 1998.  Tomasetta Aff. ¶155.  During the summer
of 2000, Bannerman brokered a marijuana deal for CW-2 by
referring him to a customer for some poor-quality marijuana that
Bannerman rejected.  Id.  Between October, 2001 and roughly
March, 2002, CW-2 brokered a series of marijuana loads for
Bannerman.  Id. ¶156.  All of this activity pre-dated CW-2's
cooperator status, which began in the summer or fall of 2002.
Id. ¶157.  When CW-2 began cooperating, he was working targeting
his (and Bannerman's) source, Ivan Moreno-Fernandez.  See

17

id.¶¶156-159.  Despite initially appearing promising, this
proactive investigation ran aground when Moreno-Fernandez
abruptly ceased dealing with CW-2.  Id. ¶159.  Moreno-Fernandez
was also apparently lying to CW-2 about his (Moreno-Fernandez's)
dealings with Bannerman during this time period.  Moreno-
Fernandez told CW-2 that he was not in touch with Bannerman --
information belied by the telephone toll analysis, which showed
contact between Moreno Fernandez's phone number and Bannerman's
voicemail box during this same time period.  Id. ¶161.

    As Agent Tomasetta explained in the affidavit, CW-2's
attempts to contact Moreno-Fernandez had been unsuccessful, and
CW-2 had no "direct evidence regarding who Bannerman [wa]s
currently receiving his drugs from, who he [wa]s selling them to,
how the drugs [we]re being transported , where they [we]re stored
in Massachusetts, who Bannerman [wa]s selling the drugs to and
what he [wa]s doing with the drug proceeds."  Id. ¶187.  And,
from a historical perspective, CW-2 was unable to advance the
investigation by providing information about, for example,
Bannerman's customers, since "CW-2 had no involvement in the
distribution fo the drugs after they arrived in Massachusetts."
Id.[7]

---

[7]Bannerman seems to complain that DEA did not use historical
information provided by CW-2 to charge Bannerman with earlier
drug deals.  See Def. Mem. 5 ("A reading of the information
provided by CW-2 in the investigative reports clearly suggests
that he could, if asked by a representative of law enforcement,

In addition to these substantive limitations on CW-2's usefulness, Agent Tomasetta informed Judge Tauro that there might be reason to question CW-2's dedication to the government's cause. In April, 2003, DEA learned from the pen register that CW-2 had contact with Bannerman's voicemail box. Id. ¶188. Concerned about this contact, which had not been directed by DEA, Agent Tomasetta obtained a search warrant and retrieved voicemail messages from that mailbox. Id. There was indeed a message from CW-2, though it was cryptic enough that Agent Tomasetta could not tell whether the message had been left in furtherance of DEA's investigation or in an attempt to damage it. Id. For this reason as well, Judge Tauro could have concluded that CW-2 was of limited utility to the ongoing investigation.

     c.  **CW-3's Limitations.** At the time Agent Tomasetta submitted the affidavit to Judge Tauro, CW-3 was in prison. Tomasetta Aff. ¶163. CW-3 was therefore in a position to provide historical information, which he did, see id. ¶¶163-166, but not to advance the investigation proactively. Id. ¶189.[8]

_____

provide direct testimony concerning drug related transactions, which are not barred by the statute of limitations against Bannerman.") What bearing this might have on Bannerman's suppression argument is not entirely clear.

     [8]Furthermore, as the redactions make clear, CW-3's information pertained to an individual who was not yet indicted at the time the discovery was sent out (John Clark, noted above) and not to Bannerman or any other of the indicted defendants who

**d.  CW-4's Limitations.**  CW-4 provided information about Gary Milo.  Tomasetta Aff. ¶¶167, 190.  This information was all historical, as CW-4 had not dealt with Milo since September, 2002.  <u>Id</u>. ¶167.  DEA considered the possibility of trying to use CW-4 proactively in the investigation, but CW-4 had been arrested by the time Agent Tomasetta submitted his affidavit, and there was a risk that Milo (or his associates) were aware of that arrest.  <u>Id</u>. ¶190.  Furthermore, Agent Tomasetta noted in his affidavit, even had CW-4 been able to entice Milo to do a drug deal with him, that would not have advanced the investigation beyond what DEA already knew -- that is, that Milo provided CW-4 with marijuana.  As Agent Tomasetta informed Judge Tauro, "CW-4 was not aware of Milo's source(s) of supply or Milo's other customers."  <u>Id</u>. ¶190.

**e.  The Confidential Informants.**  The Tomasetta Affidavit details information provided by two confidential informants ("CI-1" and "CI-2").  Each of these individuals was of limited investigatory use, as was explained in the affidavit.  CI-1, while willing to provide information, wan not willing to testify.  Tomasetta Aff. ¶191.  Furthermore, CI-1 had contact with only one of the targets, and that contact was not of a drug-trafficking nature, so attempting to introduce that element into the relationship would likely have raised suspicions.  <u>Id</u>.

_____

have sought to join in this motion.

20

CI-2 suffered from credibility problems. <u>Id</u>.
192, n.11. Perhaps more importantly, however, CI-2 had no prior
relationship with any of the targets, <u>id</u>., and was unsuccessful
in his bid to try to establish some sort of rapport with Walter
(the only person CI-2 attempted to meet). <u>Id</u>. In evaluating the
usefulness of CI-1 and CI-2, there is nothing to rock the
conviction that the affidavit was at least minimally adequate to
support Judge Tauro's issuance of the Order.

     **2.** **<u>Physical Surveillance</u>**. Bannerman suggests that the
reports produced to defendants in discovery "belie th[e] claim"
that physical surveillance was of limited utility to DEA in this
investigation. Def. Mem. 5. As proof of this alleged mis-
statement by Agent Tomasetta, Bannerman cites to the various
meetings between Walter and CW-1, which were surveilled by
agents. In doing so, Bannerman seems to forget that Agent
Tomasetta set out in his affidavit, in vivid detail, both the
fact of these meetings and their surveillance. <u>Id</u>. ¶¶93-150.
Agent Tomasetta's affidavit cannot be "belied" by the very
information that was included in that affidavit, all of which was
before Judge Tauro when he ordered the wiretap in this case. The
additional surveillance reports produced in post-indictment
discovery deal largely with surveillance done in support of the
wiretap. It is self-evident that this surveillance, which relies
on contemporaneous, tapped conversations, could not have been

accomplished without the Title III interceptions.

    **3.  <u>Specificity</u>.**  Largely as an aside, Bannerman seems to argue that Agent Tomasetta's statements in his Affidavit were "boilerplate."  <u>See</u> Def. Mem. 7-8.  In stark contrast to this conclusory accusation, Agent Tomasetta's explanations regarding the limited usefulness, likely futility, or dangerousness of utilizing cooperating witnesses, Tomasetta Aff. ¶¶186-190, confidential informants and other sources, <u>id.</u> ¶¶ 191-196, undercover agents, <u>id.</u> ¶¶198-200, physical surveillance, <u>id.</u> ¶¶203-222, and search warrants, <u>id.</u> ¶227-232, were all tailored quite specifically to the facts of this case.  Although his explanations regarding the limited usefulness, likely futility, or dangerousness of utilizing grand jury subpoenas, <u>id.</u> ¶¶201-202, subject interviews, <u>id.</u> ¶¶224-226, and pen register and trap and trace devices, <u>id.</u> ¶¶233-237, are probably similar to the explanations offered in most other large-scale drug investigations where a wiretap is sought, courts have recognized that "applications for wiretaps are generally sought by the Government precisely when other means fail"; that those other means "are usually quite similar, if not identical"; and that one common result "is the use of unoriginal language in" wiretap applications.  <u>United States</u> v. <u>Velazquez-Feliciano</u>, 107 F.Supp.2d 134, 136 (D. P.R. 2000).  The <u>Velazquez-Feliciano</u> court held that the use of such language "does not constitute a wrong,"

especially where, as here, the agent's "affidavit indeed recited numerous facts specific to this investigation in justifying the Government's request for a wiretap order."  <u>Id.</u>

**III. <u>Conclusion: The Motion To Suppress Should Be Denied.</u>**

The Tomasetta Affidavit contained at least minimally adequate facts from which Judge Tauro could reasonably conclude that electronic surveillance was a suitable next step in an investigation that had achieved some successes but that had also come up short in important areas.  Bannerman's motion to suppress evidence collected pursuant to that authorized electronic surveillance as a violation of 18 U.S.C. § 2518(1)(c) must therefore be denied.  The government submits that this motion may be denied on the pleadings, and that no hearing is necessary.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  <u>/s/ Rachel E. Hershfang</u>
RACHEL E. HERSHFANG
Assistant U.S. Attorney

Dated: December 20, 2004